T.C. Memo. 2014-189

UNITED STATES TAX COURT

WILLIAM CAVALLARO, DONOR, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

PATRICIA CAVALLARO, DONOR, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 3300-11, 3354-11.          Filed September 17, 2014.

In 1979 Ps started Knight Tool Co. ("Knight"), a contract
manufacturing company that made tools and machine parts. In 1982
P-H and Ps' eldest son developed an automated liquid-dispensing
machine they called CAM/ALOT. In 1987 Ps' three sons
incorporated Camelot Systems, Inc. ("Camelot"), a business dedicated
to the selling of the CAM/ALOT machines made by Knight. The two
companies operated out of the same building, shared payroll and
accounting services, and collaborated in further development of the
CAM/ALOT product line. Knight funded the operations of both
companies and paid the salaries and overhead costs for both.

In 1994 Ps sought estate planning advice. The professionals
they consulted advised Ps that the value of the CAM/ALOT
technology resided in Camelot (the sons' company) and not in Knight
(the parents' company) and that they should adjust their estate

[*2] planning accordingly. Ps and their sons merged Knight and Camelot in 1995, and Camelot was the surviving entity. Valuing the two companies in accordance with the advice their professionals had given, Ps accepted a disproportionately low number of shares in the new company and their sons received a disproportionately high number of shares.

After examining the merger, R issued notices of deficiency to Ps determining for each a gift tax liability and an I.R.C. sec. 6651 failure-to-file addition to tax (as well as an I.R.C. sec. 6663 fraud penalty that R eventually conceded). Ps timely petitioned this Court for redetermination. Respondent later conceded the fraud penalties and asserted, in the alternative, accuracy-related penalties under I.R.C. sec. 6662(a).

Held: The Camelot shares that Ps received in the merger in exchange for their shares of Knight were not full and adequate consideration; therefore, in 1995 Ps made a $29.6 million gift to their sons.

Held, further, because they followed professional advice, Ps had reasonable cause for failing to timely file gift tax returns and are not liable for the I.R.C. sec. 6651 additions to tax, and Ps likewise had reasonable cause for their underpayments of gift tax and are not liable for I.R.C. sec. 6662 accuracy-related penalties.

Andrew Good, Phillip Cormier, and Edward DeFranceschi, for petitioners.

Carina J. Campobasso and Derek W. Kelley, for respondent.

**[*3]**                                    CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Petitioners' backgrounds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Formation of Knight Tool Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Development of the liquid-dispensing machine. . . . . . . . . . . . . . . . . . . . . 9
    Incorporation of Camelot Systems, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Continuation of CAM/ALOT production. . . . . . . . . . . . . . . . . . . . . . . . . 14
    Relationship between Knight and Camelot. . . . . . . . . . . . . . . . . . . . . . . 16
    Allocation of income and expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Ownership of CAM/ALOT technology. . . . . . . . . . . . . . . . . . . . . . . . . . 22
    The accountants' early consideration of merger. . . . . . . . . . . . . . . . . . . . 25
    Different advice from the lawyers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Falling into line. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Later consideration of merger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Merger on December 31, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    Sale to Cookson America, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    The IRS's examination and notices of deficiency. . . . . . . . . . . . . . . . . . 35
    Petitioners' experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    The Commissioner's expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Petitioners' critiques of the Commissioner's expert.. . . . . . . . . . . . . . . . 43


OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

II.    Burden of proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    A.    "New matter". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        1.    New matter relating to liability for tax . . . . . . . . . . . . . . . . . 47
        2.    New matter relating to liability for penalty . . . . . . . . . . . . . . .49

    B.    "[E]xcessive and arbitrary".. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**[*4]** III.      Gift tax liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      A.     General gift tax principles. . . . . . . . . . . . . . . . . . . . . . . . . 52
      B.     Lack of arm's-length character. . . . . . . . . . . . . . . . . . . . . . . 54
      C.     Company valuations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

IV.    Failure-to-file additions to tax under section 6651(a)(1) and
       accuracy-related penalties under section 6662. . . . . . . . . . . . . . . . . . . . . . . 61

      A.     Applicability of failure-to-file additions to tax. . . . . . . . . . . . . . . . 62
      B.     Applicability of accuracy-related penalties. . . . . . . . . . . . . . . . . . 62
      C.     Reasonable cause defenses. . . . . . . . . . . . . . . . . . . . . . . . . . 63

           1.     Reasonable cause for failure to file. . . . . . . . . . . . . . . . . . . 64
           2.     Reasonable cause for the underpayment. . . . . . . . . . . . . . . . . 65
           3.     The Cavallaros' reliance on professional advice. . . . . . . . . . . 66

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  By statutory notices of deficiency dated November 18, 2010, the Internal Revenue Service ("IRS") determined for each of petitioners William and Patricia Cavallaro a deficiency in the Federal gift tax for the year 1995, plus an addition to tax under section 6651(a) for failure to file a gift tax return and a fraud penalty under section 6663.[1]  As an alternative to the fraud

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C., "the Code") in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some of the amounts stated in this opinion have been rounded.  These consolidated cases

(continued...)

[*5] penalties, respondent, the Commissioner of the IRS, asserted in his answers accuracy-related penalties under section 6662. The Commissioner conceded the fraud penalty after trial, and the issues remaining for decision are:

(1) whether the 19% interest Mr. and Mrs. Cavallaro received in Camelot Systems, Inc., in 1995 in exchange for their shares of Knight Tool Co., Inc., in a tax-free merger was full and adequate consideration (we find that it was not), and, if not, how much excess value was conferred on their sons through the merger as a taxable gift (we find that there was a gift in the total amount of $29.6 million);

(2) whether Mr. and Mrs. Cavallaro are liable for additions to tax under section 6651(a)(1) for failure to file gift tax returns for 1995, or whether instead the failure to file was due to "reasonable cause" (we find that petitioners had reasonable cause for that failure); and

(3) whether there are underpayments of gift tax attributable to a gift tax valuation understatement for purposes of the accuracy-related penalty imposed by section 6662, and, if so, whether any portions of the underpayments were

---

[1](...continued)
involve separate liabilities for each petitioner, but the issues are the same in each case. We therefore decide them in tandem, and each petitioner will owe his or her share of the gift tax liability in proportion to his or her ownership in Knight Tool Co., Inc.,--i.e., 49% for Mr. Cavallaro and 51% for Mrs. Cavallaro.

**[\*6]** attributable to "reasonable cause" under section 6664(c) (we find a gross gift tax valuation understatement for which there was reasonable cause).

For the reasons explained hereafter, we will sustain the determinations of liability for gift tax (though in amounts less than the IRS determined in the notices of deficiency); and because we find reasonable cause and good faith on the part of the Cavallaros, we will not sustain the IRS's determinations as to the accuracy-related penalties and the failure-to-file additions to tax.

FINDINGS OF FACT

At the time they filed their petitions, the Cavallaros resided in New Hampshire.

Petitioners' backgrounds

Mr. Cavallaro's background and occupation was that of a toolmaker. He finished school through eighth grade, attended ninth grade in which he had some difficulty, and transferred to the Haverhill Trade School Machine Shop program, from which he graduated in 1957. He is able to read, but he does so with difficulty; at trial he benefited from having documents read aloud to him. Mr. Cavallaro never attended college or obtained a post-high-school degree. During trade school Mr. Cavallaro began working part time as a janitor at Northeastern Tool Co. After graduating, he continued working there as an

[*7] apprentice, and he worked his way up to production manager. Other than his own businesses discussed hereafter, Mr. Cavallaro never worked at any other business.

Mrs. Cavallaro graduated from Haverhill High School in 1958. She attended a year of secretarial courses at college but did not obtain a post-high-school degree. She did clerical work for Bell Labs in North Andover for about a year. The Cavallaros were married in 1960, and at that time Mrs. Cavallaro stopped working outside her home.

Formation of Knight Tool Co.

In 1976 Mr. and Mrs. Cavallaro met around their kitchen table with their sons, Ken (then age 15), Paul (13), and James (12), and informed their sons that they had decided to go into business for themselves. In that year Mr. Cavallaro left Northeastern Tool Co., and he and Mrs. Cavallaro started Knight Tool Co., which they co-owned. In 1979 they incorporated Knight Tool Co., Inc. ("Knight"). Mr. Cavallaro owned 49% of Knight's stock, and Mrs. Cavallaro owned 51%. In 1993, Knight elected S corporation status.

Knight was a machine shop, and its early years were dedicated to manufacturing tools and parts that were used by other companies in the assembly of their own products. Knight was thus a contract manufacturer, and its principal

[*8] customers were defense, aerospace, and industrial companies. Knight's work included typical contract jobs in which the customer provided plans and specifications, as well as "design and build" work.

Mr. Cavallaro's principal work was making and selling the products of the tool business. He led the manufacturing operations at Knight, including entering the competitive bidding process for various jobs, supervising employees during all phases of production, and working with a team of engineers to design particular machines. Mrs. Cavallaro learned how to handle the paperwork, the money, and the phones. She paid the bills and prepared original-entry journals of their receipts and expenses, and she handed those over to an accountant who prepared their financial statements and tax returns. Though she had no formal training as an accountant or bookkeeper, she contributed her services in that role for many years.

The Cavallaros' three sons also worked in the family business--part time when they were in school, and eventually full time. Ken Cavallaro graduated from college in 1983 with a degree in marketing and management and then began working at Knight full time. Paul Cavallaro graduated from college in 1985 with a degree in finance, worked for a bank for about three years, and returned to Knight in 1988. James Cavallaro graduated from high school in 1982 and then began working full time at Knight as an apprentice machinist.

[*9] <u>Development of the liquid-dispensing machine</u>

The nature of Knight's work was to build a single custom tool at the request of a customer. That is, Knight was not a manufacturing operation with an assembly line. After about five years in operation, Knight began to feel the financial pressures associated with the cyclical nature of customer-dependent contract manufacturing and job shop work. Mr. and Mrs. Cavallaro sought outside funding from various sources, and they began looking for ways to break out of the contract manufacturing mold. Mr. Cavallaro envisioned Knight developing its own product that could be sold regularly.

By this time Ken Cavallaro was working full time for Knight in a sales and marketing role. On one occasion when Mr. Cavallaro and Ken visited a potential customer, they observed an opportunity. They saw an operation for the production of computer circuit boards, in which workers engaged in a messy and unreliable process of manually squirting liquid adhesive from tubes shaped like ketchup bottles in order to attach parts to the boards. The Cavallaros thought that a computerized machine could be devised to do this process neatly and repetitively, and that Knight might be able to mass-produce such a machine.

In 1982 Knight engineers and employees collaborated with Mr. Cavallaro and Ken Cavallaro to create the first liquid-dispensing machine prototypes for use

[*10] in through-hole mounting schemes. Knight began selling the machine under the name "CAM/ALOT", invoking the acronym for "computer assisted machine" and reflecting the hope that it would be used "a lot". Knight invested substantial time and attention into the machine--so much so that this activity was undertaken at the expense of Knight's traditional business. In its early versions, the machine had a relatively unstable cantilevered arm for dispensing the glue; it could move only along the X and Y axes; it used a stepper motor incapable of making a perfectly smooth arc; and it employed legacy Apple computer technology and software that was not easy to program.

In 1986 Knight hired Salesmark, a sales and marketing consulting company, to advise it how best to market and sell the CAM/ALOT machines. The Salesmark report confirmed the weaknesses present in the CAM/ALOT liquid-dispensing machine technology; however, its conclusion was that "Knight Tool Company appears to have what every job shop firm covets--a viable product!" Though Knight was able to sell some of the early CAM/ALOT models, profit from sales was not outpacing the cost of production, and the machine's recognizable flaws needed correction before the idea would be a sustainable revenue-producing product for Knight. Because Knight had spent a significant sum on the development of the CAM/ALOT product, the company needed either a vital

**[*11]** infusion of capital or a change in corporate structure (which would facilitate the purchase of an equity interest by a third-party investor) to maintain ongoing operations.

In January 1987 Knight sought advice on how best to solve its working capital problems. Knight hired a consulting firm "to explore the advisability of splitting off the CAM/ALOT Liquid Dispensing Systems from Knight Tool Company, Inc. to form a separate affiliated corporation". The firm reviewed Knight's financial statements and spoke with Knight principals (including Mr. Cavallaro) and concluded that the proposed two-company structure would be at risk for potential conflicts due to shifting economic benefits between them (as when a customer who was initially interested in the CAM/ALOT machine would want to "trade up" to a more specialized Knight machine). The firm was also concerned not only that removing the CAM/ALOT line of revenue would cause Knight to operate at a loss, but also that there would not be enough revenue from CAM/ALOT products to sustain a fledgling, stand-alone enterprise. Knight was thus advised not to start a new affiliated company that would be solely the sales arm of Knight, but rather to increase its operating margins by adjusting various expenses and thus increasing net income. Knight's working capital situation did

[*12] not improve, however, and from June 30 to December 30, 1987, Knight's bank debts increased from $58,000 to $352,000.[2]

Knight's thin capitalization was especially troublesome to Mrs. Cavallaro, who finally insisted that Knight revert to its original tool-making business. Mr. Cavallaro acknowledged that his real strength lay in the traditional business of tool-making, and he told Mrs. Cavallaro that it was time for Knight to call it quits on CAM/ALOT. The CAM/ALOT production equipment and remaining inventory were put into a single room. However, as we will show, manufacturing of the CAM/ALOT dispensing machines soon resumed, and little changed at Knight.

Incorporation of Camelot Systems, Inc.

Ken Cavallaro was not willing to give up on CAM/ALOT. He continued to believe they could develop a successful liquid-dispensing machine and find a market for it. He approached his parents and asked if he and his brothers could do so. The Cavallaros assented. However, no document was ever prepared conferring on the sons or their planned new company any rights--much less exclusive rights--to produce or sell the liquid-dispensing machine. To organize a

[2]The consulting firm found that in 1987 Knight had substantial equity positions in both its real estate and manufacturing plant and equipment but that it was operating at a break-even position on a cashflow basis.

[*13] new corporation, Mr. and Mrs. Cavallaro referred their sons to Fred Cirome, the attorney they had used for their own legal needs.

After Mr. Cirome had prepared the documents for incorporating Camelot Systems, Inc. ("Camelot"), all five of the Cavallaros went to his office, and the Cavallaro sons signed the articles of incorporation. At its incorporation Camelot had a total of 150 shares issued, and each son owned 50 shares. When Camelot was incorporated on November 30, 1987, Ken was 26 years old, Paul was 24, and James was 23.

At a meeting in Mr. Cirome's office, Mr. Cirome started to hand the new Camelot corporate minute book to Mr. Cavallaro; but Mr. Cavallaro deflected the suggestion that Camelot was his corporation and immediately handed the minute book instead to Ken Cavallaro, saying, "'Take it; it's yours.'" (As we explain below, an estate planning lawyer later construed this event to constitute a transfer of CAM/ALOT technology, but this construction is not corroborated by the record or any other testimony.)

The three sons jointly contributed a modest total of $1,000 to start the corporation--i.e., $333.33 each--and that was the total capital investment they made in the company during its entire existence. Consequently, they did not believe that success would come from their capital investment alone. Rather, they

**[*14]** expected to develop value by their opportunity to develop Knight's CAM/ALOT line of business, by Knight's continued support of the product, by creating a niche market for the liquid-dispensing product, and by the investment of their time. Each of the sons and their parents understood that Ken Cavallaro would be the driving force behind the CAM/ALOT product, as the one with the most relevant expertise and the one who would expend the most labor on the project. (Initially Paul Cavallaro was not working for either Knight or Camelot, but at the bank.) However, the Cavallaro sons subjectively valued equally the potential contributions of each other. They did not make any attempt to determine a market value of each brother's expected contribution but rather expected that, by virtue of their equivalent stock ownership in Camelot, each brother would profit equally from any success of the venture.

Continuation of CAM/ALOT production

After the incorporation of Camelot, Ken Cavallaro--working on the Knight payroll--began exploring ways to improve the CAM/ALOT dispensing product. He attended industry trade shows and talked with Knight customers who had purchased the machines. Ken Cavallaro then worked with Knight engineers, and they made changes to the design of the CAM/ALOT machines in an effort to eliminate the problems of which customers had complained.

[*15] The improved models of the CAM/ALOT dispensing machines incorporated a gantry mechanism rather than a cantilever, the use of servo motors rather than stepper motors, and the use of DOS-based computer programming. These additions gave the machine the ability to move along the Z axis and to dispense liquids in an arc, and they facilitated programming. Later models incorporated prefabricated components bought directly from third parties, and the machines became an amalgamation of third-party products and Knight-manufactured pieces, all undergoing final assembly at Knight's shop. Various sizes of CAM/ALOT dispensing machines were developed to accommodate different customers' assembly line needs; and as the technology improved, the machines' dispensing speed and precision increased. Ken Cavallaro remained focused on traveling to sales expos and meeting with customers; he was committed to fine-tuning the product and attempting to forecast industry needs and trends. His efforts were timely, and they coincided with a relative boom in the liquid-dispensing industry as surface-mount technology largely replaced through-hole technology in circuit board and electronics manufacturing.

However, Ken Cavallaro was not an engineer, inventor, or machinist. Though Ken Cavallaro certainly knew his way around a machine shop, it was other Knight personnel--both Mr. Cavallaro and those under his direction--who

[*16] continued to make the CAM/ALOT dispensing machines and to effect the

ideas and meet the needs that Ken Cavallaro brought in from the field.

Relationship between Knight and Camelot

Knight manufactured the CAM/ALOT machines and Camelot sold and

distributed them to third parties.  Although it is Mr. and Mrs. Cavallaro's position

that Camelot should be seen as the manufacturer of the machines and Knight as its

contractor, the contemporaneous documents (including the companies' own

financial statements[3] and filed tax returns[4] until 1994) overwhelmingly

---

[3] For example, the combined financial statement  for Knight and Camelot,
for the year ending December 31, 1991 (prepared on March 11, 1992), states:

> Organization - Knight Tool Company, Inc. was incorporated in
> 1976.  Its principal business activity is the manufacturing of machine
> parts and tools according to industry and government specifications
> and is the sole provider of machines sold by Camelot Systems, Inc.

> Camelot Systems, Inc. was incorporated in 1987.  Its principal
> business activity is the selling of computerized liquid dispensing
> machines.  [Emphasis added.]

As we note later, when the IRS requested the financial statements in 1998,
Knight's accountant Kevin McGillivray doctored the narrative to state instead that
Knight was "the sole provider of machines owned by Camelot" (emphasis added),
in order to be consistent with the Cavallaros' position that pre-merger Camelot
was not a mere sales agent but rather had owned the technology and was the
manufacturer of the machines (with Knight as its contractor).

[4]On Knight's original Forms 1120, "U.S. Corporation Income Tax Return",

(continued...)

[*17] characterize Knight as the manufacturer of the machines and Camelot merely as the seller. As late as 1995 an agreement was reached with Cognex Corp. ("Cognex") for the purchase of hundreds of "vision systems" to be used in CAM/ALOT machine production, and the agreement was drawn up between Cognex and Knight (not Camelot), consistent with the reality that Knight manufactured the CAM/ALOT liquid-dispensing machines on its own account and used Camelot as its sales agent.

Camelot received a purchase order from a customer and then submitted an order (either oral or written) to Knight for the requested model of CAM/ALOT machine, including any customer-requested specifications or modifications. Knight's personnel, facilities, and manufacturing equipment created the CAM/ALOT machines. Camelot then paid for each machine a price that included

---

[4](...continued)
for the years ending June 30, 1990, through December 31, 1993 (Knight elected to change its fiscal yearend in 1993), Knight reported its business activity as "Manufacturing" of "Tools" and selected business code no. 3540 (which signifies the "Manufacturing" of "Metalworking machinery"). On Camelot's original Forms 1120 for the tax years 1988 through 1992, Camelot reported its business activity as "Sales" of "Machinery & Equip", and selected the business code no. 5008 (which signifies the "Wholesale Trade" of "Machinery, equipment, and supplies"). For tax year 1993, when Camelot claimed S corporation status and filed its return on Form 1120S, "U.S. Income Tax Return for an S Corporation" (a form that required a business code but not a verbal statement of business activity), Camelot continued to use the same business code, 5008, that it had used in prior years.

[*18] Knight's direct costs plus an "overhead burden rate". (Mr. and Mrs. Cavallaro claim that this rate was set so that Camelot would purchase the CAM/ALOT technology incrementally over time, but the evidence does not support this claim.)

Some of Camelot's purchase orders were for batches of machines, as to which Ken Cavallaro expected eventual but not-yet-received orders from customers. Knight did not bill Camelot until the machines were completed and ready for delivery, and Camelot did not pay for the machines until the ultimate customer had paid Camelot. Thus, Knight was at risk for non-payment, and Camelot was effectively immune from such risk.

As reflected by the documentary evidence, Camelot had no employees from 1987 to 1995. All the persons who worked on CAM/ALOT machines after Camelot's incorporation--including Ken Cavallaro--were on the Knight payroll and received all their wages from Knight.[5]

In addition to a shared payroll system, Camelot's and Knight's financial affairs overlapped in other ways. In 1989 Camelot and Knight entered into a joint

---

[5] For example, for 1992 and 1993 Knight reported spending $457,072 and $748,864 for salaries and wages as a part of its selling and administration expenses, whereas for the same years Camelot reported spending only $61,032 and $86,205 for salaries and wages, all of which was for its international affiliate, Camelot S.A.

[*19] financing agreement for an $850,000 line of credit and a $150,000 term loan, for which Knight and Camelot executed cross-corporate guaranties of their respective obligations; but the risk was allocated not to Camelot (or the Cavallaro sons) but to Knight (and Mr. and Mrs. Cavallaro): The agreement was collateralized by all of Knight's business assets and an agreement by Mr. and Mrs. Cavallaro not to sell or encumber the 216 River Street property, Knight's place of business. Mr. and Mrs. Cavallaro also executed personal unlimited guaranties of Knight's and Camelot's financial obligations.[6] In 1992 the parties executed two subsequent financing agreements with the same lender and identical guaranties as for the 1989 loan.

Camelot did not have its own bank accounts or books of account. Rather, intercompany accounts were created on Knight's books so that Camelot could be billed for certain expenses, and this accounting device was used to charge Camelot for overhead expenses. With minor exceptions,[7] Camelot's bills were paid using Knight's funds.

---

[6]Before and after the incorporation of Camelot in 1987, Mr. and Mrs. Cavallaro mortgaged their house to support Knight's operations.

[7]Mr. McGillivray explained that Camelot did make some direct payments for its own expenses, such as for those costs associated with trade shows, advertising, marketing, the west coast and foreign offices, and warranty costs.

**[*20]** <u>Allocation of income and expenses</u>

Apart from those minor exceptions, the record does not reflect a consistent or systematic approach to the overall allocations of income and expenses between the two companies, and Knight received less income than it should have as the manufacturer of the machines, while Camelot received more than it should have as the mere seller.[8] Knight provided the equipment and personnel for making the machines, paid the bills, and bore the risk; but profits were disproportionately allocated to Camelot. We attribute this disproportion not to the objective values of the companies but either to the deliberate benevolence of Mr. and Mrs. Cavallaro toward their sons or else to a non-arm's-length carelessness born of the family relationships of the parties.

Camelot and Knight's outside accountant, Mr. McGillivray, testified at trial that sums of money were allocated between the companies as needed to cover expenses incurred by one or the other. However, Mr. McGillivray's credibility at trial was damaged when he confessed to having given false testimony to the Court

---

[8]Although 90% of Knight's business was for CAM/ALOT machines, Knight did not enjoy a profit margin similar to Camelot's on the sales of the dispensing machines. As illustrated by one seven-month representative snapshot, from October 1991 to April 1992, Camelot reported an average gross profit percentage of 24%, whereas Knight's average gross profit was a mere 6%.

**[*21]** during his first day of testimony,[9] and we therefore discredit his explanation of the financial allocations between the companies. Mr. McGillivray prepared a spreadsheet comparing the balance sheets of the two companies and (at a point before the current controversy arose) handwrote a note in the margin (presumably to management) that he would "'run the numbers to shift more of [the] burden to [Camelot].'"

Until at least as late as 1994, no allocation of expense to Camelot was made for Knight workers who built the CAM/ALOT liquid-dispensing machines. Rather, their time was accounted for as Knight time, and Camelot paid for it indirectly only as it paid for a machine to which Knight's employee expense had been allocated as a cost of sales. This was deemed the "overhead burden rate".

The fact that Knight was the manufacturer of the CAM/ALOT machines (rather than Camelot's contractor) and Camelot was its sales agent (rather than the manufacturer) is itself evidence tending to show that Knight, not Camelot, owned the technology, the subject to which we now explicitly turn.

---

[9]Mr. McGillivray admitted that he had lied when he initially testified that he did not know who altered the companies' previously prepared financial statements, tending to make Camelot look like the "owner" and not just the "seller" of the CAM/ALOT technology. In fact, it was Mr. McGillivray himself who altered the original statements, many years after he had first created them.

**[*22]** <u>Ownership of CAM/ALOT technology</u>

It is undisputed that Knight originally owned the CAM/ALOT technology. We find that Knight never transferred it to Camelot and that Knight, not Camelot, owned the incremental improvements in that technology over the succeeding years. The record contains no document of any sort memorializing any transfer of CAM/ALOT technology from Knight to Camelot,[10] and no document granted Camelot any rights (exclusive or otherwise) to any CAM/ALOT technology. No document restricted Knight from licensing any aspect of the technology to another manufacturer or user, nor from using any CAM/ALOT-related technology on machines it might sell itself on its own account. On the contrary, with two exceptions, the documents in the record all tend to show affirmatively that Knight continued to own the technology and intangibles associated with the CAM/ALOT machines.

The two exceptions are: (1) mechanical drawings of assorted parts for machines produced for various customers, which state that Camelot owns the drawings--the earliest of which is dated November 3, 1992; and (2) copyright notices on the software, which state that the copyright holder is Camelot. The software copyright notices appeared on the computer screens used with

---

[10]We discuss below a belated and fictitious 1995 "confirmatory" agreement.

[*23] CAM/ALOT machines and were visible to a user upon startup of the machine. Any probative value of the drawings and copyright notices is outweighed by the other evidence of Knight's ownership:

The few public registrations of intellectual property were all owned by Knight: The CAM/ALOT trademark was registered to Knight on August 27, 1985, and it remained registered to Knight until December 31, 1995, when Knight assigned it to Camelot in connection with the merger on that date. As for patent registrations, the dispensing machine as a whole had never been patented (and was presumably not patentable as such). Rather, as of 1987, the CAM/ALOT technology subsisted in Knight's know-how, trade secrets, assembled work force, and other similar intangible assets. Various improvements or features of the machine might have been patentable; and before the 1995 merger of Knight and Camelot Mr. Cavallaro filed four patent applications related to pumps he had designed. In his patent applications he identified not Camelot but Knight as his assignee.[11]

---

[11]The evidence does not show that these particular pumps turned out to have great value or utility in the CAM/ALOT process, but we consider them significant, since we think that, between parties dealing at arm's length, the supposed acquirer of the CAM/ALOT technology would have assured ownership of all the related patents. Knight owned a few patents; Camelot owned none.

**[*24]**  In 1992--before the current controversy arose--Knight and Camelot had an occasion to determine who was the owner of the technology, and they determined it was Knight, not Camelot.  The companies engaged the accounting firm of Ernst & Young ("E&Y") for advice on various tax issues, including the availability of research and development ("R&D") tax credits pursuant to section 41.  E&Y accountants studied Camelot's and Knight's financial statements and past expenditures and determined that a portion of the work that had been done in prior years by Knight's engineers could be characterized as R&D costs eligible for the tax credit.

When that study was concluded, the accountants prepared and signed amended tax returns for Knight for the years 1990 to 1993, claiming the R&D credits for Knight.[12]  Only after the involvement of Mr. and Mrs. Cavallaro's estate-planning attorneys in 1994 and 1995 (discussed below) did the accountants prepare another set of amended returns for both Camelot and Knight, this time

---

[12]Petitioners have challenged the significance of Knight's claiming the R&D credit by arguing that Knight might have been entitled to claim the credit even if Camelot was the owner of the technology.  This argument can be assumed valid, but it misses the point:  There is no suggestion that, at the relevant time, Knight entertained this late-arising thought that a non-owner could claim the credit.  Rather, when the idea first arose that Camelot might be treated as the owner of the technology, Knight's personnel immediately saw a dissonance between that idea and Knight's original claim of the credits; hence, they filed amended returns to try to fix the problem and accommodate the new idea.  See infra note 15.

[*25] disclaiming the R&D credits previously taken by Knight and claiming the R&D credits for Camelot.

The accountants' early consideration of merger

Mr. and Mrs. Cavallaro had prepared wills in the past, but as the combined fortunes of Knight and Camelot improved, they believed that their estate plan should be reviewed. At their request, E&Y accountants began to consider the Cavallaros' estate plan. They observed that the elder Cavallaros' generation possessed value that would eventually be passed down to the three sons (generating estate tax liability), and they considered various strategies to minimize the estate tax, including a "Grantor Retained Annuity Trust", or "GRAT". The E&Y professionals concluded that merging the two companies was a necessary first step to transfer some of Knight's value to the sons through Camelot (and therefore achieve the Cavallaros' estate planning objectives) and to eventually sell the combined entities.

Different advice from the lawyers

Unbeknownst to their E&Y accountants, the Cavallaros had also retained attorneys at the Boston law firm of Hale & Dorr to give them estate planning advice. Mr. and Mrs. Cavallaro had seen a brochure from that firm that included the name of a long-time acquaintance of Mrs. Cavallaro--Louis Hamel--and they

[*26] contacted him. At a meeting in October 1994, Mr. Hamel reviewed the Cavallaros' estates and businesses, and observed the same issue that the accountants had seen--i.e., that passing to the next generation the value held in the parents' generation (i.e., in Knight) would result in estate tax liability for the estates of Mr. and Mrs. Cavallaro. Accordingly, Mr. Hamel determined that the Cavallaros should claim instead that the value of the CAM/ALOT technology inhered in Camelot, and was thus already owned by the three sons. He based this determination on his conclusion that a one-time transfer of some of the CAM/ALOT technology had occurred in 1987 (when Camelot was created) and that there had also been ongoing transfers from time to time since then. This conclusion was based not on documentation of transfers (there was none) but on a supposed significance that Mr. Hamel contrived from the November 1987 incident in which Mr. Cavallaro had handed the Camelot minute book to Ken Cavallaro at the meeting in Mr. Cirome's office. Mr. Hamel testified at trial that he construed this as a ceremonial or symbolic act for the transfer of the CAM/ALOT technology[13]--a construction that the evidence does not support.

---

[13]At trial Mr. Hamel explained that the events of the November 1987 meeting "reminded me of the ancient way of transferring land. You own the land, hand some twigs to the buyer or donoree and say, 'Take it; it's yours.'"

**[*27]** Given the lack of documentation for the transfer, Mr. Hamel suggested in 1994 that the Cavallaros should prepare affidavits and a "confirmatory" bill of sale attesting to a 1987 transfer, so that when they died and their estate matters were being addressed (by the IRS in particular), there would be evidence that not their company, Knight, but rather Camelot (and through it their sons) had owned the valuable technology underlying the CAM/ALOT machine. An associate of Mr. Hamel interviewed Mr. Cavallaro and Ken Cavallaro; and as to the ownership of the technology, Mr. Cavallaro said nothing to support a 1987 transfer. On the contrary, when Mr. Cavallaro was asked whether there were "ever any agreements either written or oral transferring the technology that Knight Tool developed" he said that he "[n]ever gave it any thought".

At trial, Mrs. Cavallaro confirmed Mr. Cavallaro's recitation of the facts. She was asked: "[H]ow did the transfer of the technology from Knight to Camelot occur? Was there a document signed between you and your husband as the owners of Knight transferring the technology [in 1987]?" In response, Mrs. Cavallaro stated: "Why would there be a document? Nobody told us there should be a document." Nonetheless, Hale & Dorr prepared affidavits and a

[*28] "Confirmatory Bill of Sale" that asserted a 1987 technology transfer from Knight to Camelot.[14]

Falling into line

Before the affidavits and confirmatory bill of sale were executed by Mr. Cavallaro and Ken Cavallaro on May 23, 1995, David Frac (then chief financial officer of both Camelot and Knight) transmitted them to E&Y for review. Then Mr. Hamel began a correspondence campaign to convince the E&Y accountants, as well as Mr. McGillivray, to adopt his view of the CAM/ALOT technology ownership, as outlined in the affidavits. In one letter to E&Y describing the transfer of CAM/ALOT technology, Mr. Hamel highlights his estate planning concerns:

> From an estate planning perspective, the present two-corporation arrangement is advantageous. I see no advantage to merging them, and I think we both agree that a merger of any kind would leave us with the problem of getting the product of the merger out of the estates of the older generation * * *.

---

[14] Ken Cavallaro's affidavit, as prepared by Hale & Dorr, reads: "Knight Tool transferred the original dispensing product to Camelot when the latter was formed in 1987 and Knight Tool received no compensation for this transfer, which was a gift by the shareholders of Knight Tool to the shareholders of Camelot."

[*29] In turn, Mr. McGillivray wrote a letter to Hale & Dorr, asserting various errors he saw present in the affidavits. Responding to Mr. McGillivray's letter, Mr. Hamel wrote:

> With regard to the ownership of the "technology," I am going to be guided by the history which comes out of [the] interviews with the key players. In any history there are a few events which do not fit the picture which the historian sees as "what happened." History does not formulate itself, the historian has to give it form without being discouraged by having to squeeze a few embarrassing facts into the suitcase by force.

Of course, the "embarrassing facts" were those facts that showed that Knight owned the technology and always had, and Mr. Hamel advocated "squeez[ing] those facts] * * * into the suitcase by force"--i.e., disregarding or suppressing those facts in order to take the more advantageous position.

The accountants initially objected to Mr. Hamel's proposal that the CAM/ALOT technology had been transferred in 1987. They explained that Mr. Hamel's idea was at odds with all the evidence and that it was at odds with Knight's recent amended returns claiming R&D credits for the engineering work on the CAM/ALOT machine.[15]

---

[15] Eric Wolf, E&Y partner, wrote in his letter to Mr. Hamel:

> We understand the affidavits and the fax [sic] that they present. There are other documents in the public domain that may not

(continued...)

**[*30]** As a result of Mr. Hamel's correspondence campaign, however, the previously separate tracks of advice--one from the accountants at E&Y and Mr. McGillivray, and the other from the attorneys at Hale & Dorr--now came together for the first time. The contradiction was evident to all the professionals: The accountants had assumed no 1987 transfer (and thus believed there was a need for a means to transmit value to the next generation), but the attorneys postulated a 1987 transfer (and subsequent transfers) pursuant to which that value had already been placed in the hands of the next generation. The attorneys eventually prevailed, however, and the accountants acquiesced. Eventually all of the advisers lined up behind Mr. Hamel's suggestion that a 1987 transfer be memorialized in the affidavits and the confirmatory bill of sale. They provided a draft of the documents, which Mrs. Cavallaro read aloud to Mr. Cavallaro. After they reported a few typographical errors, the attorneys prepared final versions, which Mr. Cavallaro and Ken Cavallaro executed on May 23, 1995.

---

[15](...continued)
necessarily reflect the facts as stated in the affidavits. Specifically, there have been tax returns filed for 1993 which do not coincide with the ownership of technology issue relative to the way in which R&D credits have been claimed, and there may be certain financial statements which have been issued which also do not appropriately reflect that which is stated in the affidavits. We should discuss whether or not any steps should be taken to address these inconsistencies.

[*31] Mr. and Mrs. Cavallaro had been oblivious to the disagreement between the accountants and the lawyers about the transfer of CAM/ALOT technology. All they knew was that their acquaintance and lawyer, Mr. Hamel, advised them that Mr. Cavallaro's act of passing the corporate minute book to Ken Cavallaro in November 1987 warranted their asserting that a technology transfer had occurred. Mr. Cavallaro followed Mr. Hamel's advice and signed the affidavit and confirmatory bill of sale.

Later consideration of merger

In the early 1990s Ken Cavallaro and Camelot began distributing the CAM/ALOT machines internationally and established a customer base in Europe. In order to keep pace with changing European Union manufacturing regulations, however, Camelot had to become CE certified[16]--an expensive and time-consuming process--and it did so. Unbeknownst to them at the time, in order for Camelot and the CAM/ALOT products to be in compliance with CE marking, Camelot had to certify that all the liquid-dispensing machine components complied with European Union manufacturing Directives. This meant that the

---

[16]Since 1993, products sold in the European Economic Area must display a symbol called the "CE Marking". CE stands for the French phrase "Conformité Européenne", which means "European Conformity". This symbol is affixed to a product as testimony that it meets all relevant Directives, i.e., regulations.

[*32] manufacturer of CAM/ALOT products, Knight, also had to achieve the CE marking; but Mr. Cavallaro made it clear to Ken Cavallaro that he was unwilling to spend the time and money necessary for Knight to do so.

Camelot wanted to continue expanding its presence in the European liquid-dispensing machine market, and the two companies began discussing the possibility of a merger, which the Cavallaros stated would circumvent the need for Knight to undergo CE certification independently. That is, they believed that a merged company would inherit Camelot's CE marking without further certification.

Merger on December 31, 1995

After all the discussion of estate planning issues and of continued CAM/ALOT production for distribution in Europe, in late 1995 Camelot and Knight decided to begin preparations for a merger of the two companies. Accordingly, the Cavallaros engaged E&Y to determine the respective values of the two companies. Timothy Maio of E&Y, using a market-based approach, identified company comparables for Knight and the newly formed merged entity. He explained that he found no suitable comparables for the pre-merger Camelot, and so he did not value it as a stand-alone company. He valued the proposed

[*33] combined entity as being worth between $70 and $75 million, with Knight's portion of that value being between $13 and $15 million.

On December 31, 1995, Knight and Camelot merged in a tax-free merger with Camelot as the surviving corporation. The stock of the merged company was distributed as follows: Mrs. Cavallaro received 20 shares, Mr. Cavallaro received 18 shares, and 54 shares each were distributed to Ken, Paul and James Cavallaro.[17] Mr. and Mrs. Cavallaro explained that they distributed the shares according to the relative value of each company, as determined by Mr. Maio (that is, 19% of the combined entity to the former shareholders of Knight--Mr. and Mrs. Cavallaro; and 81% of the combined entity to the founding shareholders of Camelot--Ken, Paul, and James Cavallaro). However, in determining these relative values,

---

[17]The Commissioner seems to argue that, because Ken Cavallaro's contribution to the ongoing success of Camelot was more significant than those of his brothers, he should have received more shares in the final sale of the Camelot entity--an argument that may conflate an ownership interest in a company with compensation for services rendered for that company. From Camelot's incorporation, Ken Cavallaro's ownership interest in Camelot was the same as his brothers'--that is, each brother owned 50 shares. For Ken Cavallaro's substantial ongoing services for the company he received a commensurate annual salary (larger than those of his brothers). However, while the brothers' capital contributions to Camelot were trivial (totaling $1,000), their ownership of equal shares assured that they would benefit equally from Knight's beneficial treatment of Camelot, and this fact made the merger of the two companies a useful means for Mr. and Mrs. Cavallaro to confer their wealth to the next generation with an equal share going to each son.

[*34] Mr. Maio had assumed--contrary to fact--that pre-merger Camelot had owned the CAM/ALOT technology.  It had not.  Consequently, Mr. Maio overstated the relative value of Camelot and understated the relative value of Knight.  We find that as a result, by means of this distorted allocation of the stock, Mr. and Mrs. Cavallaro conveyed disproportionate value to their sons in amounts totaling $29.6 million.[18]

Sale to Cookson America, Inc.

On July 1, 1996, Cookson America, Inc. ("Cookson Group") purchased Camelot (i.e., the merged companies).  The sale price was $57 million in cash with a contingent additional amount--i.e., up to $43 million in potential deferred

---

[18]The determination of the total amount of those gifts should be made by determining the value of the post-merger company and the extent to which that value is allocable to the two pre-merger companies and then comparing that allocation of value to the allocation of the post-merger stock.  For the first step of that process, petitioners contend that the post-merger value is $72.8 million and the Commissioner contends it is $64.5 million.  Somewhat surprisingly, we determine that we do not need to make a specific finding of the value of the merged company nor even of the relative values of Knight and Camelot.  Rather, as we explain below, the  persistent assumption by the Cavallaros and their experts that Camelot and not Knight owned the technology makes their valuation invalid and causes them to fail to carry their burden of proof, leaving us to accept the amount of gift that the Commissioner determined, reduced to the extent of his partial concession.

[*35] payments based on future profits.[19] After the July 1996 sale no further

payments were made from Cookson Group to the Camelot shareholders. On the

basis of stock ownership, Mr. and Mrs. Cavallaro received a total of $10,830,000

(i.e., 19% of $57 million) while Ken, Paul, and James each received $15,390,000

(i.e., 27% of $57 million).

The IRS's examination and notices of deficiency

In January 1998 the IRS opened an examination of Knight's and Camelot's

1994 and 1995 income tax returns. During the income tax examination the IRS

learned that there might be a possible gift tax issue in connection with the 1995

---

[19]Neither petitioners nor the Commissioner look to the post-merger
July 1996 sale price ($57 million plus possible contingent payments of up to
$43 million) as the measure of the merged company's value at the time of the
merger in December 1995. However, the Cavallaros argue in the alternative, that,
if we determine that gift tax is due, the best evidence of the value of the merged
company as of the valuation date is $57 million, the amount paid by Cookson
Group six months after the merger (and the amount assumed in the notice of
deficiency). The Commissioner counters that, if we were to value the merged
company according to the purchase price set forth in the contract with Cookson
Group, we would have to include at least some discounted portion of the $43
million contingent payment as well. The Commissioner's point is well taken; and
since all the experts agree that the value is greater than $57 million, we do not
adopt that figure. Moreover, since neither party has provided us with a means for
projecting what portion of the contingent payments could have been expected
(though none were eventually paid) and should be included, and neither has
explained how we could take into account a post-valuation-date event, when we
generally do not do so, see Estate of Gilford v. Commissioner, 88 T.C. 38, 52
(1987), we lack the predicate for using the July 1996 sale price for this
December 1995 valuation.

[*36] merger of the two companies and thus also opened a gift tax examination in February 1998. The IRS issued third-party summonses to E&Y seeking documents that the accounting firm created or received in the fall of 1994 and in 1995 while working on estate tax and corporate merger issues with Mr. Hamel. Petitioners filed petitions to quash these summonses and fought this issue to the Court of Appeals for the First Circuit, which ultimately affirmed the District Court's order denying petitioners' motion to quash and enforcing the summonses. See Cavallaro v. United States, 284 F.3d 236 (1st Cir. 2002), aff'g 153 F. Supp. 2d 52 (D. Mass. 2001).

On July 7, 2005, Mr. and Mrs. Cavallaro each filed a Form 709, "United States Gift (and Generation Skipping Transfer) Tax Return", for the 1995 tax year, reporting no taxable gifts and no gift tax liability.

On November 18, 2010, the IRS issued statutory notices of deficiency to Mr. Cavallaro and Mrs. Cavallaro for the tax year 1995, determining (without having obtained an appraisal) that pre-merger Camelot had zero value and that each of the parents had made a taxable gift of $23,085,000 to their sons when Knight merged with Camelot, resulting in a gift tax liability of $12,889,550 for

[*37] each petitioner.[20]  In addition, the notices of deficiency determined additions to tax pursuant to section 6651(a)(1) for failure to file timely gift tax returns, as well as section 6663(a) penalties for fraud.  In his answers the Commissioner asserted, for the first time, alternative section 6662 accuracy-related penalties.

Petitioners' experts

Mr. and Mrs. Cavallaro offered into evidence two expert reports with different but reconcilable valuations of the merged company.  The first was the report completed by Mr. Maio in January 1996--contemporaneously with the merger--which had concluded that the merged company was worth between $70 and $75 million and that only $13 to $15 million of that value was attributable to Knight.  The Cavallaros offered the January 1996 report as evidence of the fact that they had obtained a contemporaneous valuation.

The Cavallaros' second expert report was composed in preparation for trial by John Murphy of Atlantic Management Co., who used a market-based approach similar to that used by Mr. Maio.  Accordingly, Mr. Murphy's report also

---

[20]The Commissioner initially determined the same gift amounts for both petitioners, despite the fact that Mrs. Cavallaro owned 51% of Knight before the merger and Mr. Cavallaro owned 49%.  The Commissioner later reduced the determined deficiency amounts and gift tax liabilities and reflected the actual division of ownership, claiming that Mr. Cavallaro made gifts totaling $14,538,300 and Mrs. Cavallaro made gifts totaling $15,131,700.

[*38] identified company comparables for Knight[21] and the newly formed merged company. (Mr. Murphy explained in his report that he did not find suitable comparables for Camelot and so he, too, did not value it as a stand-alone company. Rather, he reckoned (reasonably, we find) that the value of post-merger Camelot minus the value of pre-merger Knight equals the value of pre-merger Camelot and allows a comparison of the relative values of the two pre-merger companies.)

Mr. Murphy's report differed from Mr. Maio's in only one respect, which modestly increased Knight's relative value: he added a royalty adjustment which allocated 2% of Camelot's income to Knight for the use of the CAM/ALOT trademark and the limited use of Mr. Cavallaro's patented pump technology in a few of the CAM/ALOT models. Notwithstanding the fact that he made the 2% adjustment, he stated:

> Atlantic Management does not agree that a transfer pricing adjustment is necessary or that royalty payments are warranted in light of the respective roles of the two companies, the pricing structure between the two pre-merger entities, and payments made

---

[21]Mr. Murphy chose "companies that are similar in nature to Knight", but Mr. Murphy considered Knight's nature to be not that of a manufacturer of the CAM/ALOT machines and the owner of the technology but rather, in effect, to be that of a machine shop to which Camelot "outsourced the assembly of the product line". In addition, Mr. Murphy's chosen comparables were intended to be similar to Knight in (among other things) "net profit"; but as we have shown, Knight's profits had been understated for years. Thus, Mr. Murphy's comparables were not in fact similar to Knight.

**[\*39]** directly to William Cavallaro by Camelot for his technological contributions.

Mr. Murphy valued the combined entity at $72,800,000 (i.e., within the range of Mr. Maio's $70 to $75 million), of which he concluded that 18.8%--i.e., $13,700,000--was Knight's portion.

In discerning the relative values of Knight and Camelot, both of petitioners' experts assumed (contrary to our findings) that Camelot owned the CAM/ALOT technology and that Knight was a contractor for Camelot. As Mr. Murphy explained his assumptions--

> the liquid dispensing machines basically became * * * Ken and Camelot's product [in 1987]. And so from that point, it was our understanding that as ideas flourished, as concepts were nurtured through Camelot, they would be brought to Knight, Knight in the capacity of a contract manufacturer.

Neither Mr. Maio nor Mr. Murphy opined about the values of the companies if one assumes that Knight was not a mere contract manufacturer but instead owned the technology and manufactured the machines, with Camelot as its sales agent.

The Commissioner's expert

In preparation for trial, the Commissioner retained Marc Bello of Edelstein & Co. to determine the 1995 fair market values of Knight and Camelot. Mr. Bello assumed (as we have found) that Knight owned the CAM/ALOT

[*40] dispensing-machine technology. Mr. Bello valued the combined entities at approximately $64.5 million (i.e., a lower aggregate value than Mr. Maio and Mr. Murphy determined), and Mr. Bello determined that 65% of that value--i.e., $41.9 million--was Knight's portion. To make this valuation, Mr. Bello used not the comparable sales approach that petitioners' experts had used but rather a discounted cashflow method.[22]

We summarize here Mr. Bello's methods and conclusion, though, as we will explain, we decide in favor of the Commissioner but do not base the outcome of these cases on his expert's opinion. Mr. Bello started with the companies' 1995 annualized pre-tax earnings (operating profits) and adjusted for cashflow items, such as working capital, capital expenditures, and depreciation, in order to determine the adjusted net income amounts. Then, using Robert Morris

---

[22]The discounted cashflow method is an income-based valuation method which analyzes future cashflow projections of a given company and discounts them (typically using a discount rate such as the weighted average cost of capital) to present values as of the valuation date. The discount rate is calculated by projecting economic income for a fixed number of years (usually between 3 and 10 years), and then assuming a terminal value at the end of that period. In theory, the amount a willing buyer would pay for the valued entity is equal to the present value of the projected economic income, plus the discounted terminal value. See, e.g., Estate of Jung v. Commissioner, 101 T.C. 412, 424 n.6 (1993).

[*41] Associates ("RMA") industry data[23] as well as data from the Almanac of Business and Financial Ratios as benchmarks, he made normalizing adjustments to the ongoing after-tax cashflows of both companies to better reflect his belief that a significant amount of revenue had been improperly allocated to Camelot, given Knight's ownership of the technology.[24]

On its income tax returns, Camelot had self-reported its business activity as "Sales" and had used the code 5008 ("Machinery, Equipment, and Supplies" in the "Wholesale Trade" category).[25] However, when Mr. Bello was evaluating Camelot's performance against industry norms to determine whether any of Camelot's numbers could have been artificially inflated, Mr. Bello chose to use data corresponding to the Standard Industrial Classification ("SIC") code 5084 ("Wholesaling Industries"). The RMA Annual Statement Studies describe the companies in SIC 5084 as follows: "'INDUSTRIAL MACHINERY AND

---

[23]RMA is a professional association that, through the inputs from its members, serves the financial services industry by providing resources and information on risk. In 2000 Robert Morris Associates changed its name to the Risk Management Association.

[24] Mr. Bello determined that in 1995 Knight's net income after tax, net of debt, should have been $3,657,974 and Camelot's should have been $1,959,206.

[25]The 1993 instructions to Form 1120 advised that the reporting codes, "[t]hough similar in format and structure to the Standard Industrial Classification (SIC) codes, * * * should not be used as SIC codes."

[*42] EQUIPMENT. Distribution of industrial machinery, equipment, and supplies. This industry does not include office, restaurant, or hotel fixtures, or air conditioning and refrigeration equipment. (SIC No. 5084).'"

Camelot's unadjusted annualized 1995 profit percentage before taxes was 15.1%. The RMA combined industry data (sorted by sales) for profit percentage before taxes for 1995 for SIC code 5084 was 4.1%. Mr. Bello used this 4.1% as a starting point and then accounted for Camelot's success by putting it in the top 90% of the RMA data distributors by applying a 3.65% premium.[26] He then determined that Camelot's adjusted net income before tax should have been $3,186,608, i.e., only 7.5% of Camelot's 1995 annualized adjusted revenue of $42,488,102. Mr. Bello then redistributed the remaining profit to Knight, resulting in a profit split between the two companies of 36.03% of the combined value to Camelot, and 63.97% to Knight. (The unadjusted values had allocated 72.56% to Camelot and 27.44% to Knight.) After making this normalizing adjustment to the net cashflows, Mr. Bello calculated the projected cashflows for the four years following the merger (1996 - 99), assumed a terminal value, and applied the discount rate.

---

[26] Mr. Bello stated he made the adjustment to "reflect the [Camelot] strategy of premium pricing and higher profitability as of the valuation date"; however, he did not explain how he came up with the number 3.65.

**[*43]** Petitioners' critiques of the Commissioner's expert

In addition to disagreeing with Mr. Bello's (correct) assumption that Knight owned the CAM/ALOT technology and was itself the manufacturer, Mr. and Mrs. Cavallaro advance two main arguments against Mr. Bello's valuation methodology. First, they contend that Mr. Bello improperly used RMA data in his analysis, particularly when he selected SIC industry codes for analyzing the financial statements of Knight and Camelot; and they claim his normalizing adjustments to each company's revenue streams were thus improper. (They do not suggest the proper SIC codes that Mr. Bello should have used in his report.)

Second, Mr. and Mrs. Cavallaro assert that Mr. Bello's valuation report was not independent because it was improperly influenced by respondent's counsel. The Cavallaros allege that before Mr. Bello conducted his analysis, respondent's counsel informed Mr. Bello (1) that the 1995 affidavits were false and Knight, not Camelot, owned the CAM/ALOT technology,[27] (2) that he should not interview executives at either company,[28] and (3) that he should rely only on company

[27]Since we find that Knight, not Camelot, owned the technology in 1995, we do not consider Mr. Bello's opinion to be undermined by his so assuming.

[28]The Cavallaros argue: "Mr. Bello stated in his report that had he conducted a site visit or interviews, 'the results of [his] analysis might have been different.'" At trial, Mr. Bello countered that conducting a site visit for a company

(continued...)

[*44] financial documents prepared before 1994 in his valuation.[29] The Commissioner points to Mr. Bello's testimony that he nonetheless performed an independent analysis and that, if a contrary finding regarding the technology had been warranted, he would have stated it in his report. The Commissioner also points to Mr. Bello's conclusions as an indicator of his independence; Mr. Bello valued the combined entity at $64,500,000, which is far less than the values found by both Mr. Maio (valuing the combined entity at $70-$75 million) and Mr. Murphy ($72.8 million).

---

[28](...continued)
that had been sold to a third party 16 years earlier would seem to add negligible value. Mr. Bello testified that, "considering that there were representations from the owners and a lot of company background information, * * * under my professional standards there was enough information to gain an understanding of the companies that I didn't foresee it to go back and interview the owners of the business."

[29]Mr. Bello seems not to have followed this instruction. In his report he cites company documents, financial and otherwise, prepared after 1994.

[*45]                                                    OPINION

I.      Introduction

We must determine the extent to which Mr. and Mrs. Cavallaro made gifts to their sons by merging the parents' company (Knight) with the sons' company (Camelot) and allowing the sons an 81% interest in the merged entity. The parties agree that this issue calls for a determination of the fair market value of the merged entity and of the relative fair market values of Knight and Camelot on the eve of that merger. In his notices of deficiency, the Commissioner determined identical taxable gifts made by Mr. and Mrs. Cavallaro each in the amount of $23,085,000, for a total gift of $46,170,000, but the Commissioner's position has evolved during the course of this litigation, and he has conceded that the value of the gifts is less than determined in the notices of deficiency. For ease of comparison, the positions of the notices of deficiency, the Cavallaros' expert (Mr. Murphy), and the Commissioner's expert (Mr. Bello) are summarized here:

**[\*46]**    <u>Competing values (rounded, in millions) and allocations</u>

|  | Notices of deficiency | Cavallaros' expert | Commissioner's expert |
|---|---|---|---|
| Total value of merged company | $57.0 | $72.8 | $64.5 |
| Knight Value: | | | |
|   Percent | 100 | 18.8 | 65 |
|   Dollar | $57.0 | $13.7 | $41.9 |
| Camelot value: | | | |
|   Percent | -0- | 81.2 | 35 |
|   Dollar | -0- | $59.1 | $22.6 |
| 81% of total value | $46.1 | $59.0 | $52.2 |
| Gift amount | $46.1 | <$0.1> | $29.6 |

II.    <u>Burden of proof</u>

In general, the IRS's notice of deficiency is presumed correct, "and the petitioner has the burden of proving it to be wrong". <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>see also</u> Rule 142(a).  The Commissioner has conceded that the taxable gifts totaled not $46.1 million (as in the notices of deficiency) but instead $29.6 million (as yielded by Mr. Bello's analysis).  Where the Commissioner has made a partial concession of the determination in the notice of deficiency, the petitioner has the burden to prove that remaining determination wrong.  See <u>Silverman v. Commissioner</u>, 538 F.2d 927, 930 (2d Cir. 1976)

[*47] (holding that the burden of proof does not shift where the Commissioner's change of position operates in favor of the taxpayer), aff'g T.C. Memo. 1974-285; cf. Rule 142 (shifting the burden "in respect of * * * increases in deficiency"). However, the Cavallaros argue that, for two reasons,[30] the burden of proof shifted to the Commissioner. Because the burden of proof is important to the outcome in these cases, we address those two arguments:

A.     "New matter"

1.     New matter relating to liability for tax

Rule 142(a)(1) provides: " The burden of proof shall be upon the petitioner, * * * except that, in respect of any new matter, * * * it shall be upon the respondent." Petitioners point out that the notices of deficiency presume that Camelot was a shell company with zero value, whereas at trial the Commissioner

---

[30]Before trial the Cavallaros had argued that the burden of proof shifted pursuant to section 7491(a)(1), which provides that the burden of proof will shift to the Commissioner on a factual issue "[i]f * * * a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer". However, section 7491(a)(1) is applicable to cases arising in connection with examinations commenced after July 22, 1998, Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, sec. 3001(c)(1), 112 Stat. at 727, whereas it was before that date--i.e., on February 10, 1998--that the IRS commenced the examination at issue here by sending petitioners a Substitute Form 4564, "Information Document Request", requesting information regarding the values of Knight and Camelot in 1995 and 1996. Therefore, section 7491(a)(1) is not applicable, and it appears the Cavallaros have abandoned this contention.

**[*48]** acknowledged that Camelot accounted for 35% of the value of the merged entity. Petitioners argue that the Commissioner's litigating position is a new theory which constitutes "new matter" as to which the Commissioner has the burden of proof. However, the Court of Appeals for the First Circuit (to which an appeal would presumably be made in these cases) has articulated the meaning of "new matter" in the opinion that petitioners cite and rely on, Estate of Abraham v. Commissioner, 408 F.3d 26, 35-36 (1st Cir. 2005), aff'g T.C. Memo. 2004-39:

> [W]here the Notice of Deficiency fails to adequately "describe the basis on which the Commissioner relies to support a deficiency determination" and the Commissioner seeks to establish the deficiency on a basis not described in the Notice, the burden shifts to the Commissioner on that new basis. Shea v. Comm'r of Internal Revenue, 112 T.C. 183, 197, 1999 WL 177471 (1999); see T.C.R. 142(a)(1). "A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence." Wayne Bolt & Nut Co. v. Comm'r, 93 T.C. 500, 507, 1989 WL 124141 (1989). But if the theory "merely clarifies or develops the original determination[, it] is not a new matter in respect of which [the Commissioner] bears the burden of proof." Id.
>
> The Estate's main argument is that the Notice was "latently ambiguous, overly broad and confusing" and failed to specify all the elements of the Commissioner's argument * * *
>
> Acceptance of the Estate's arguments would amount to a requirement that the Notice of Deficiency be as detailed as trial briefs. There is no such requirement. The standard of specificity for notices of deficiency is much lower. "In fact, if a deficiency notice is broadly worded and the Commissioner later advances a theory not

**[*49]** inconsistent with that language, the theory does not constitute new matter, and the burden of proof remains with the taxpayer." Abatti v. Comm'r, 644 F.2d 1385, 1390 (9th Cir.1981); see also Shea, 112 T.C. at 191.  * * *

The IRS's notice of deficiency states:  "It is determined that under IRC Section 2511 donor's merger of Knight Tool Co. into Camelot Systems, Inc. in return for 19% of the stock in Camelot Systems, Inc. resulted in a gift of $23,085,000.00 to the other shareholders of Camelot Systems, Inc."[31]  The Commissioner's position at trial was "not inconsistent with that language".  The Commissioner has never abandoned that theory nor contended otherwise.  His partial concessions as to Camelot's non-zero value did not require a new theory or change the issues for trial.  The Commissioner's trial position was therefore not "new matter".

      2.    New matter relating to liability for penalty

The Commissioner acknowledges that, unlike the additions to tax for failure to file timely under section 6651(a)(1),[32] the section 6662(a) accuracy-related

---

[31]The language quoted above from the notice of deficiency issued to Mrs. Cavallaro does not appear in the notice of deficiency issued to Mr. Cavallaro; but the Commissioner explains:  "It appears that this Explanation of Adjustments sheet was inadvertently omitted from the statutory notice of deficiency issued to petitioner William Cavallaro.  However, this inadvertent omission clearly did not prejudice Mr. Cavallaro, as shown by his petition, which is virtually identical to the petition filed by Mrs. Cavallaro."

[32]The section 6651(a)(1) additions to tax arose in connection with an

(continued...)

[*50] penalties were not determined in the notice of deficiency, that they therefore do constitute "new matter", and that he has the burden of proof[33] as to the applicability of these penalties.  However, the Commissioner contends that--

> petitioners nevertheless bear the burden of showing reasonable cause to escape the application of these penalties. * * *  The statutory notices of deficiency issued to petitioners included the civil fraud penalty under I.R.C. § 6663 [which was conceded after trial] and consequently raised the issue of reasonable cause.  Therefore, the defense of reasonable cause under I.R.C. § 6664 (c) is not a new matter in the case and petitioners bear the burden of proof in showing reasonable cause under I.R.C. § 6664(c).

We have previously held that, when a penalty is asserted as "new matter", the Commissioner has the burden to prove that the taxpayer's failure "was not due to reasonable cause or was due to willful neglect", Arnold v. Commissioner, T.C. Memo. 2003-259, slip op. at 10-11 (citing cases); see also Schmidt v.

---

[32](...continued)
examination that began before July 22, 1998 (so that the Commissioner does not have the burden of production; see supra note 30) and was determined in the notice of deficiency (so that it is not new matter).  Consequently, the Cavallaros have the burden of proof as to the additions to tax.  As we explain below, they succeed in a defense of reasonable cause.

[33]Where section 7491(c) applies, the Commissioner bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case; but that provision is not applicable here because these cases arose in connection with an examination that began before July 22, 1998.  Ochsner v. Commissioner, T.C. Memo. 2010-122, slip op. at 18 n.11; see supra note 30.

[*51] Commissioner, T.C. Memo. 2014-159, at *57-*58; and the Commissioner

points us to no authority supporting his contention that a taxpayer's "reasonable

cause" defense against one penalty is necessarily implicated in the IRS's assertion

of an alternative penalty, so that the taxpayer therefore has the burden to prove

reasonable cause as an equivalent defense to the alternative penalty.  Moreover,

we are able to resolve the reasonable defense issue (in the Cavallaros' favor)

however the burden is allocated, so we need not address further the issue of

burden of proof on reasonable cause.  See Martin Ice Cream Co. v. Commissioner,

110 T.C. 189, 210 n.16 (1998) ("we decide the issue on a preponderance of the

evidence; therefore, the allocation of the burden of proof does not determine the

outcome").

> B.     "[E]xcessive and arbitrary"

As a second basis for shifting the burden of proof, petitioners assert:

> Alternatively, the controlling law also states that, where the
> assessment is shown to be excessive, naked, arbitrary or without any
> foundation, the burden shifts to the Respondent. * * * The gift
> amount allegations and gift tax deficiencies asserted in the
> now-abandoned Notices of Deficiency were not based on any
> appraisal, and were excessive and arbitrary.

As we have already shown, the notices of deficiency were not "abandoned".  It is

evidently true that the Commissioner did not obtain an appraisal before issuing the

[*52] notices, but this did not render the notices "arbitrary". Rather, the Commissioner had discovered that, in merging the companies and granting stock to their sons, petitioners had followed advice to contrive technology transfers that had never occurred and to "squeeze a few embarrassing facts into the suitcase by force". This was a sufficient basis for issuing the notices, and to require more would violate the general rule that we do not "look behind" the notice of deficiency. Graham v. Commissioner, 82 T.C. 299, 308 (1984), aff'd, 770 F.2d 381 (3d Cir. 1985).

III.    Gift tax liability

    A.    General gift tax principles

Section 2501(a) imposes a tax on the transfer of property by gift. The donor is primarily responsible for paying the gift tax. Sec. 2502(c); see also 26 C.F.R. sec. 25.2502-2, Gift Tax Regs. The gift tax is imposed upon the donor's act of making the transfer, rather than upon receipt by the donee, and it is measured by the value of the property passing from the donor, rather than the value of enrichment resulting to the donee. 26 C.F.R. sec. 25.2511-2(a). Donative intent on the part of the donor is not an essential element for gift tax purposes; the application of gift tax is based on the objective facts and circumstances of the

[*53] transfer rather than the subjective motives of the donor. 26 C.F.R. sec. 25.2511-1(g)(1), Gift Tax Regs.

Section 2512(b) provides: "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift". Such taxable transfers include not only those transfers for which no valuable consideration is received, as in the case of a typical gift, but "embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor." 26 C.F.R. sec. 25.2512-8, Gift Tax Regs.

Where, as here, the transaction was made between family members, the transaction is "subject to special scrutiny, and the presumption is that a transfer between family members is a gift." Harwood v. Commissioner, 82 T.C. 239, 258 (1984) (citing Estate of Reynolds v. Commissioner, 55 T.C. 172, 201 (1970)), aff'd without published opinion, 786 F.2d 1174 (9th Cir. 1986).

The parties dispute whether the merger transaction was made in the "ordinary course of business", that is, "a transaction which is bona fide, at arm's

**[\*54]** length,[34] and free from any donative intent", which is "considered as made for an adequate and full consideration in money or money's worth." 26 C.F.R. sec. 25.2512-8.

### B. Lack of arm's-length character

We find that the 1995 merger transaction was notably lacking in arm's-length character. If Camelot had offered itself to the market for acquisition claiming ownership of the CAM/ALOT technology, it is inconceivable that a hypothetical acquirer would do anything other than demand to see documentation of Camelot's ownership interest--documentation that we have found does not exist. An <u>unrelated</u> hypothetical acquirer would never have been be satisfied with Camelot's mere assertions of ownership, or its statements that an oral agreement effecting the transfer occurred at some point after Camelot's incorporation. Instead, upon realizing no such documentation was available, an unrelated party either would have offered to purchase Camelot at a much lower price or (more likely) would have walked away from the deal altogether.

---

[34]See <u>Estate of Bongard v. Commissioner</u>, 124 T.C. 95, 122-123 (2005) ("An arm's-length transaction has been defined as 'A transaction between two unrelated and unaffiliated parties', or alternatively, a transaction 'between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.' Black's Law Dictionary 1535 (8th ed. 2004)").

[*55] Likewise, if Knight were dealing with an unrelated party which sold machines that had been manufactured at Knight's risk by Knight employees on Knight premises using technology developed by Knight personnel, where Knight had owned the only public registrations of intellectual property and had claimed ownership of the technology in prior tax filings, it defies belief to suggest that Knight would have simply disclaimed the technology and allowed the unrelated party to take it. If an unrelated party had purchased Camelot before the merger and had then sued Knight to confirm its supposed acquisition of the CAM/ALOT technology, without doubt that suit would fail. Camelot did not even own the CAM/ALOT trademark registration.

But these cases, unlike those hypothetical scenarios, involve parents who were benevolent to their sons and involve sons who could therefore proceed without the caution that normally attends arm's-length commercial dealings between unrelated parties. The Cavallaros manifestly gave no thought in 1987 to the question of which entity would own what intangibles. They gave no thought thereafter to who was paying for the further development of the technology. When the question of technology ownership came up in the context of claims for R&D credits, the professionals comfortably assumed--without challenge--that of course Knight owned the technology. And when the question finally arose

[*56] explicitly, it arose in an estate-planning context, when the question was "How can we best convey wealth to our sons?" and donative intent was front and center. In that context, the "confirmatory" bill of sale confirmed a fiction.

There is no evidence of any arm's-length negotiations occurring between the representatives or executives of the two companies. Instead (and despite a wholesale lack of evidence as to Camelot's ownership of the technology), Knight agreed to take a less than 20% interest in the merged company, effectively valuing Camelot at four times the value of Knight. As we stated in Dauth v. Commissioner, 42 B.T.A. 1181, 1189 (1940):

> Where the facts show that the parties to a sale demonstrate such a lack of interest as to the price at which one sells to another that the buyer purportedly gives a sum greatly in excess of the worth of the property, such facts indicate that what was done was not a real business transaction and "was not intended to have the usual results and significance of a bona fide business deal." Pierre S. du Pont [v. Commissioner], * * * [37 B.T.A. 1198] p. 1242 [(1938)]. * * *

Accordingly, we find that the merger transaction between Knight and Camelot was not engaged in at arm's length and was not in the ordinary course of business.

C.    Company valuations

Valuation is ultimately a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The value of the gift depends on the fair market value of the property, which is "the price at which such property would

**[*57]** change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." 26 C.F.R. sec. 25.2512-1. When an interest in a business is being valued for the determination of a gift of transferred property (pursuant to section 2512), 26 C.F.R. section 25.2512-3(a), Gift Tax Regs., provides:

> Care should be taken to arrive at an accurate valuation of any interest in a business which the donor transfers without an adequate and full consideration in money or money's worth. The fair market value of any interest in a business, whether a partnership or a proprietorship, is the net amount which a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. The net value is determined on the basis of all relevant factors including--
>
>     (1) A fair appraisal as of the date of the gift of all the assets of the business, tangible and intangible, including good will;
>
>     (2) The demonstrated earning capacity of the business; and
>
>     (3) The other factors set forth in paragraph (f) of § 25.2512-2 relating to the valuation of corporate stock, to the extent applicable.[35]

---

[35]Generally, the value of stock in a company is the "fair market value per share * * * on the date of the gift." 26 C.F.R. sec. 25.2512-2(a), Gift Tax Regs. However, where actual selling prices are unavailable, then, in the case of shares of stock, the factors to be considered are "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors." Id. para. (f)(2). "Other relevant factors" include--

the goodwill of the business; the economic outlook in the particular

(continued...)

[*58] To assist the Court in properly valuing Knight and Camelot, both parties retained experts in business valuation to determine the respective values of the closely held S corporations in these cases. The Court evaluates expert opinions in the light of each expert's demonstrated qualifications and all other evidence in the record. Parker v. Commissioner, 86 T.C. 547, 561 (1986). The appraiser must use common sense and informed judgment to analyze all the facts and circumstances of each case, maintaining "a reasonable attitude in recognition of the fact that valuation is not an exact science." Rev. Rul. 59-60, sec. 3.01, 1959-1 C.B. 237, 238. We are not bound by an expert's opinions and may accept or reject an expert opinion in full or in part in the exercise of sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. at 561-562.

---

[35](...continued)
industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *

Id. para. (f) (flush language).

**[\*59]**  Both of Mr. and Mrs. Cavallaros' experts (i.e., Mr. Maio hired in 1995 in anticipation of the merger and Mr. Murphy hired to testify at trial) valued the companies using market-based approaches.  They compared Knight and post-merger Camelot to public companies that are arguably similar, if one assumes that Camelot owned the technology (and had been entitled to the income that had been allocated to it).  But that assumption is contrary to fact.  Mr. and Mrs. Cavallaro did not meet their burden to prove that Camelot actually owned the technology, yet they proposed no alternative valuation on the (accurate) assumption that it was Knight, instead, that owned the technology and had been entitled to most of the income that the CAM/ALOT product line had generated.  Because we find incorrect the Cavallaros' fundamental premise, on which their valuations are based (that is, we find that Knight owned the CAM/ALOT technology), Mr. Maio's and Mr. Murphy's market-based comparison valuations must be disregarded entirely--leaving petitioners with no evidence on this critical issue as to which they have the burden of proof.

The Commissioner's expert concluded that the total value of the combined entities at the date of the merger was $64.5 million, that 65% of that was attributable to Knight, and that 35% of the total was what Camelot's shareholders should have received in the merger.  Mr. and Mrs. Cavallaro's experts posited a

**[\*60]** higher value of the combined entities, $72.8 million, though asserting that no gift was made because the portion received by the Cavallaros accurately reflected the value of Knight relative to Camelot at that time.

In putting forth Mr. Bello's conclusions of value, the Commissioner has thus conceded that the value of the combined entities is not greater than $64.5 million, and that the value of the gift made in the merger transaction is not greater than $29.6 million. Although petitioners make several serious criticisms of his method, their own higher valuation of $72.8 million moots those criticisms insofar as the value of the entire merged entity is at issue.

Petitioners' criticisms might have greater significance on the next sub-issue--i.e., determining what portion of that value is properly attributable to each of the two companies--but we need not resolve those criticisms or attempt to correct the Commissioner's figures. It is the Cavallaros who have the burden of proof to show the proper amount of their tax liability, and neither of the expert valuations they provided comports with our fundamental finding that Knight owned the valuable CAM/ALOT technology before its merger with Camelot. We are thus left with the Commissioner's concession, effectively unrebutted by the party with the burden of proof. The Cavallaros risked their cases on the proposition that Camelot had owned the CAM/ALOT technology (and on a

[*61] valuation that assumed that proposition), but they failed to prove that proposition (and the evidence showed it to be false). That being so, "[i]t would serve no useful purpose to review our agreement or disagreement with each and every aspect of the experts' opinions." CTUW Georgia Ketteman Hollingsworth v. Commissioner, 86 T.C. 91, 98 (1986). We conclude that Mr. and Mrs. Cavallaro made gifts totaling $29.6 million on December 31, 1995.[36]

IV.   Failure-to-file additions to tax under section 6651(a)(1) and
      accuracy-related penalties under section 6662

In the notices of deficiency for 1995, the IRS determined that Mr. and Mrs. Cavallaro are both liable for the addition to tax imposed by section 6651(a)(1) for failure to timely file gift tax returns. In his answers, the Commissioner asserted the section 6662 accuracy-related penalties (in the alternative to the fraud penalties that the Commissioner no longer asserts). We

---

[36]Since we base this conclusion on petitioners' failure of proof, it is all but immaterial that the Commissioner's expert reached this $29.6 million gift number by an arguably flawed analysis under which the total value of the merged entity was $64.5 million, Knight's value was $41.9 million (i.e., 65% of the total), and Camelot's value was $22.6 million (i.e., 35% of the total). Given petitioners' failure of proof and our consequent finding of a $29.6 million gift, if we assume instead the total value that petitioners' expert determined--$72.8 million--then arithmetic shows us that Knight's value must have been $43.4 million (i.e., 59.6% of the total) and Camelot's value must have been $29.4 million (i.e., 40.4% of the total). We do not choose between these two possibilities.

**[\*62]** hold that the Commissioner has shown that the additions and the penalties are applicable, but we sustain the Cavallaros' defenses of "reasonable cause".

### A.  Applicability of failure-to-file additions to tax

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a timely return (unless the taxpayer proves that such failure is due to reasonable cause and is not due to willful neglect, as discussed below).  We have found that Mr. and Mrs. Cavallaro did make gifts totaling $29.6 million, and it is undisputed that Mr. and Mrs. Cavallaro did not file Forms 709 for the 1995 gifts until July 7, 2005, approximately nine years late.  Therefore, as a threshold matter, the addition to tax imposed by section 6651(a)(1) is applicable in each case here (subject to the defense described below).

### B.  Applicability of accuracy-related penalties

Section 6662 imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax where the taxpayer's return reflects either a "substantial estate or gift tax valuation understatement" or a "gross valuation misstatement".  Section 6662(a), (b)(5), (h).[37]  Pursuant to section 6662(g)(1),

---

[37]The accuracy-related penalty is also imposed where the tax underpayment is attributable to the taxpayer's negligence or disregard of rules or regulations, and the Commissioner here alleges such negligence.  However, we need not reach the issue of negligence, since the mathematical bases for a "substantial estate or gift

(continued...)

[*63] there is a substantial estate or gift tax valuation understatement where the value of property reported on an estate or gift tax return is 50% or less of its correct value and the underpayment exceeds $5,000. Where such property is reported at a value less than 25% of its correct value, there is a "gross valuation misstatement" and the penalty imposed under section 6662 is increased from 20% to 40% of the tax imposed. Sec. 6662(h).

Because we have found that Mr. and Mrs. Cavallaro made gifts totaling $29.6 million but (as they admit) reported gifts of zero on their gift tax returns, the gross valuation misstatement penalty imposed by section 6662(h) is applicable here (subject to the defense discussed below).

C.    Reasonable cause defenses

Both the section 6651(a)(1) addition to tax and the section 6662(a) accuracy-related penalty are subject to a "reasonable cause" defense. The defenses arise from distinct statutory sources, but where a taxpayer asserts reasonable cause as a defense from liability for both because he relied on the advice of a competent adviser, the two overlap significantly. We therefore discuss them in tandem below.

---

[37](...continued)
tax valuation understatement" or a "gross valuation misstatement" are met here.

**[*64]**       1.       Reasonable cause for failure to file

The failure-to-file addition to tax is applied "unless it is shown that such failure is due to reasonable cause and not due to willful neglect".  Sec. 6651(a)(1). 26 C.F.R. section 301.6651-1(c), Proced. & Admin. Regs., provides:  "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause."  "Whether the elements that constitute 'reasonable cause' are present in a given situation is a question of fact", based on the circumstances of the individual case.  United States v. Boyle, 469 U.S. 241, 249 n.8 (1985). "[W]illful neglect" is defined as "a conscious, intentional failure or reckless indifference".  Id. at 245.

Circumstances that constitute reasonable cause include good faith reliance on a mistaken legal opinion of a competent tax adviser that no liability was due and it was unnecessary to file a return may also constitute reasonable cause.  Id. at 250-251; McMahan v. Commissioner, 114 F.3d 366, 369 (2d Cir. 1997) ("reliance on a mistaken legal opinion of a competent tax adviser--a lawyer or accountant-- that it was unnecessary to file a return constitutes reasonable cause"), aff'g T.C. Memo. 1995-547.  As the Supreme Court articulated in Boyle, 469 U.S. at 251:

[*65] When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" do not demand such actions.

### 2. Reasonable cause for the underpayment

Similarly, under section 6664(c)(1), a taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if he can show, first, "that there was a reasonable cause" for the underpayment and, second, that he "acted in good faith with respect to" the underpayment, then no accuracy-related penalty "shall be imposed". Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability, his knowledge and experience, and the extent to which he relied on the advice of a tax professional. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs. "Reliance on * * * professional advice or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.

The Court's caselaw sets forth the following three requirements in order for a taxpayer to use reliance on a tax professional to avoid liability for a

**[\*66]** section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

### 3. The Cavallaros' reliance on professional advice

Mr. and Mrs. Cavallaro made the requisite showing of reasonable cause. They had little to no advanced education, including no formal accounting, legal, or business education. Mr. and Mrs. Cavallaro hired advisers who were competent professionals with sufficient expertise to justify reliance. They engaged professionals from a well-known accounting firm and a well-known law firm to structure the tax-free merger of their S corporation, Knight Tool, with their sons' S corporation, Camelot Systems. As discussed above, the professionals initially had differing opinions regarding the ownership of the CAM/ALOT technology, and the issue was explicitly considered by those professionals. The team of advisers eventually structured the merger transaction according to the idea proposed by the Cavallaros' attorney Mr. Hamel at Hale & Dorr--that is, that on the date of the merger, the CAM/ALOT technology belonged to Camelot and not to Knight (and therefore that no gift occurred) because of a prior transfer. They

[*67] obtained the valuation report by Mr. Maio based on this assumption and allocated the post-merger stock accordingly.

Mr. Hamel was the author of this fiction of a 1987 transfer, which he concocted from facts recounted to him by the Cavallaros about the 1987 meeting. Using those facts, Mr. Hamel advised the Cavallaros that they had transferred the CAM/ALOT technology in 1987 and that Knight therefore did not still own it in 1995. Thus, on the basis of professional advice from someone they perceived to be competent and reliable--a friend from many years prior who had become a partner at a well-known and successful law firm--the Cavallaros believed that their company no longer owned the technology in 1995. Since they believed that Camelot owned it instead, they reasonably and in good faith thought that the post-merger division of stock that was based on Mr. Maio's valuation was reasonable.

Mr. and Mrs. Cavallaro also assert that they provided necessary and accurate information to their advisers. The Commissioner disputes this assertion, arguing that Mr. and Mrs. Cavallaro do not have the defense of reasonable cause for failing to file gift tax returns because Mr. and Mrs. Cavallaro "provided [their attorney] with incorrect information and worked with him in developing the [false] 'picture' depicted in the affidavits." As we stated above, however, it was Mr. Hamel's idea to create the affidavits when he realized that, if the value of the

[*68] CAM/ALOT liquid-dispensing machine technology remained in Knight, the corporation wholly owned by Mr. and Mrs. Cavallaro, then their eventual estate tax liability would be greater. Mr. Hamel sought to establish a basis for arguing that the valuable CAM/ALOT technology was already owned by the younger generation (i.e., in their Camelot corporation), yet he was faced with the problem that there was no documented transfer of the technology--in 1987, when Camelot was incorporated, or later. Mr. Cavallaro could hardly be said to have contributed to creating a false picture of that alleged transfer when he stated in the interview preceding the affidavit's creation that he had not even given the transfer of technology a thought. It was Mr. Hamel who concocted the idea that the technology transfer happened when Mr. Cirome handed the newly formed Camelot minute book to Ken Cavallaro. Mr. and Mrs. Cavallaro were later convinced by Mr. Hamel to adopt the idea but cannot be fairly accused of providing false information.

There is also no evidence in the record that Mr. and Mrs. Cavallaro provided any false or incomplete information to Mr. Maio when he was hired to perform an independent valuation of the two companies before their merger. At trial, Mr. Maio explained that he followed his normal practice in gathering information from which to value a company: he conducted on-site visits of the

**[\*69]** two companies, he reviewed relevant company materials, and he interviewed key principals of both. He explained that he also used the relevant financial information of Camelot and Knight, as provided to him by the companies' accountants. And not only did Mr. Maio state that he was given complete access to the necessary records of both companies, but he also testified that at the time he did his initial valuation he did not see either the affidavits prepared by Mr. Cavallaro and Ken Cavallaro or the "Confirmatory Bill of Sale". We find that Mr. and Mrs. Cavallaro have established that they provided necessary and accurate information to their advisers.

Finally, Mr. and Mrs. Cavallaro persuasively testified that they actually relied in good faith on the advisers' judgment when they structured the merger of Knight and Camelot and when they received inadequate compensation (in the form of shares of the new, merged entity) for their shares of Knight. Neither of the Cavallaros received advanced formal education, and neither was familiar with sophisticated legal matters; and though both had participated in the process of forming a company, neither had previously been a part of a corporate merger. Exercising their best judgment, they sought out professionals with the relevant experience in structuring this type of transaction, and then they acted according to the professionals' recommendations. The value in dispute inhered in invisible,

[*70] intangible assets, consisting of intellectual property that was mostly not even susceptible of public registration. When their lawyer advised them that it had been transferred, they were hardly in a position to contradict him. In ways that sometimes surprise laymen, the law sometimes deems transfers to have taken place; in fact, the very gifts that we find here are indirect, deemed transfers. If the lawyers and accountants said that a transfer had taken place when Camelot was created in 1987, then from the Cavallaros' point of view, why not? The fault in the positions the Cavallaros took was attributable not to them but to the professionals who advised them. (Since those professionals are not parties here and have not had a full opportunity to explain or defend themselves, we refrain from further comment on them.)

The value of the consideration that Mr. and Mrs. Cavallaro received in the merged Camelot and Knight entity was based on the valuation figures arrived at by Mr. Maio of E&Y; and at the time, none of their advisers questioned the numbers or suggested to the Cavallaros that there might be gift tax implications. We find that Mr. and Mrs. Cavallaro did in fact rely on the judgment and advice of their professional advisers that the technology at issue had already been owned by their sons' company since 1987 (and thus was not being transferred in 1995). The Cavallaros therefore had reasonable cause not to file gift tax returns in connection

**[*71]** with the 1995 merger and, when they later did file returns, had reasonable cause to report that their gift tax liability was zero.

Because both Mr. and Mrs. Cavallaro disclosed all the relevant facts regarding Knight and Camelot to their experienced accounts and estate-planning attorneys and followed their advice in good faith, both Mr. and Mrs. Cavallaro have a successful defense of reasonable cause to the section 6651(a)(1) addition to tax and the section 6662 accuracy-related penalty.

So that the gift tax liabilities can be computed,

Decisions will be entered under

Rule 155.