T.C. Memo. 2019-144

UNITED STATES TAX COURT

WILLIAM CAVALLARO, DONOR, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent[*]

PATRICIA A. CAVALLARO, DONOR, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 3300-11, 3354-11.              Filed October 24, 2019.

Ps owned KT Corp., and their three sons owned CS Corp. Ps
and their sons merged the two in 1995, and CS Corp. was the
surviving entity. In valuing the two companies for purposes of the
merger, they incorrectly assumed that CS Corp. owned intangibles
that instead KT Corp. owned. Ps therefore accepted a dispropor-
tionately low number of shares in the new company, and their sons
received a disproportionately high number of shares. Ps thereby
made disguised gifts to their sons consisting of portions of the value
of KT Corp.

---

[*]This opinion supplements our previously filed opinion Cavallaro v.
Commissioner, T.C. Memo. 2014-189, aff'd in part, rev'd in part and remanded,
843 F.3d 16 (1st Cir. 2016).

R issued notices of deficiency to Ps determining for each a gift tax liability. In Cavallaro v. Commissioner, T.C. Memo. 2014-189, we held that Ps had failed to meet their burden to prove the respective values of KT Corp. and CS Corp. On the basis of that failure, and by treating R's valuation of CS Corp. as a concession (compared to the zero value in the notice of deficiency), we held that Ps made gifts to their sons in 1995 totaling $29.7 million. Ps appealed. The Court of Appeals affirmed our factual findings and our holding that Ps had the burden of proof; but the court held that we erred in our statement of the content of Ps' burden of proof and concluded that we should have considered Ps' arguments rebutting R's expert witness testimony on the subject of valuation, in order to determine whether the resulting determination was arbitrary and excessive. On remand we now consider Ps' arguments concerning R's expert's report.

Held: R's valuation expert's error caused him to overvalue the disguised gifts by $6.9 million and rendered R's valuation arbitrary and excessive.

Held, further, after correcting for that error, we determine that Ps gave their sons gifts valued at a total of $22.8 million.

Matthew D. Lerner, for petitioners.

Carina J. Campobasso and Derek W. Kelley, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge: These cases are before us on remand from the Court of Appeals for the First Circuit for reconsideration on the issue of valuation.

**[\*3]** <u>See</u> <u>Cavallaro v. Commissioner</u> ("<u>Cavallaro III</u>"), 842 F.3d 16 (1st Cir. 2016), <u>aff'g in part, rev'g in part and remanding</u> <u>Cavallaro v. Commissioner</u> ("<u>Cavallaro</u> <u>II</u>"), T.C. Memo. 2014-189.[1]  At the trial of these cases the Commissioner presented the report of an expert witness to assert, for purposes of sections 2501 and 2502,[2] the proposed value of disguised gifts that William Cavallaro and Patricia Cavallaro had made to their sons.  The question before us on this remand is whether the Commissioner's expert's valuation is "arbitrary and excessive".  If it is, then we are tasked with determining the proper amounts of the Cavallaros' tax liabilities.

## FINDINGS OF FACT

Many of the relevant facts underlying these cases are set forth in <u>Cavallaro II</u> and <u>Cavallaro III</u>, and we assume familiarity with those opinions.  We restate and summarize certain relevant facts below.

---

[1]Before petitioning this Court for redetermination of their gift tax deficiencies, petitioners were involved in litigation related to the examination by the Internal Revenue Service ("IRS"), which resulted in <u>Cavallaro v. United States</u>, 284 F.3d 236 (1st Cir. 2002) (affirming the denial of petitioners' motion to quash a third-party recordkeeper summons).

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), as amended and in effect for the relevant year, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

[*4] The Cavallaro family, Knight and Camelot, and the merger

In 1979 the Cavallaros incorporated Knight Tool Co., Inc. ("Knight"), a machine shop and contract manufacturer. Mrs. Cavallaro owned 51% of Knight's stock, and Mr. Cavallaro owned 49%. The Cavallaros' three sons (Ken, Paul, and James) worked in the family business at various times. Mr. Cavallaro and his son Ken worked with Knight engineers and employees to develop a liquid-adhesive dispensing machine prototype, which came to be known as the "CAM/A LOT" machine. Ken, Paul, and James incorporated Camelot Systems, Inc. ("Camelot"). Knight manufactured the CAM/A LOT machines, and Camelot sold them.

In 1994 the Cavallaros' accountants at Ernst & Young ("E&Y") reviewed the situations of the Cavallaros, Knight, and Camelot. E&Y accountant Lawrence Goodman signed a letter dated December 15, 1994,[3] recommending the merger of the two companies. He projected that in such a merger "the majority of the shares (possibly as high as 85%) [will] go[] to Bill and Patti." E&Y valued the merged company as being worth between $70 and $75 million. However, attorneys at

_____

[3]Mr. Goodman's letter of December 15, 1994, is useful. It was commissioned by the Cavallaros and was written by their own accountant, who was knowledgeable about their affairs and had no bias against them; on the contrary, he came to his conclusions while pursuing their interests. He wrote his letter before becoming aware of the attempt (described below) by the Cavallaros' attorneys at Hale & Dorr to concoct a transfer of intangibles and before the current controversy arose. In these respects it is very good evidence.

**[*5]** Hale & Dorr later advised the Cavallaros to assume (incorrectly) that Camelot, not Knight, owned the significant intangible assets. The accountants did not agree with that view, and one of them wrote Mr. Hamel a letter concerning errors he perceived in the affidavits that were prepared by Hale & Dorr; but Mr. Hamel responded: "History does not formulate itself, the historian has to give it form without being discouraged by having to squeeze a few embarrassing facts into the suitcase by force." As a result the accountants acquiesced, and E&Y eventually attributed to Mr. and Mrs. Cavallaro considerably less than 85% of the stock in the merged company. See Cavallaro II, at *28-*31.

On December 31, 1995, the Cavallaros and their sons merged Knight and Camelot. In that merger Mrs. Cavallaro received 20 shares of the new company, Mr. Cavallaro received 18 shares, and 54 shares each were distributed to Ken, Paul, and James. Thus, Mr. and Mrs. Cavallaro received 19% of the shares, not the "the majority of the shares (possibly as high as 85%)" that E&Y had foreseen. Rather, it was the Cavallaros' sons who received the majority of the shares of the new company--i.e., 81% in the aggregate--which allegedly represented the pre-merger value of Camelot.

[*6] Examination and notices of deficiency

The IRS conducted a gift tax examination relating to the Cavallaros, and on November 18, 2010, the IRS issued statutory notices of deficiency to Mr. Cavallaro and Mrs. Cavallaro for the tax year 1995, determining that, by means of the merger, each of the parents had made a taxable gift of $23,085,000 to their sons, resulting in gift tax liabilities. The Cavallaros timely petitioned this Court for redetermination of their gift tax deficiencies.

Valuations in Cavallaro II

During trial Mr. and Mrs. Cavallaro entered into evidence two reports on the issue of valuation--the E&Y valuation performed by Timothy Maio in 1996 (valuing the combined companies as of October 31, 1995), on which the post-merger share distribution had been based, and the valuation prepared for trial in Cavallaro II by John Murphy of Atlantic Management Co. Mr. Maio had valued the combined company at $70 to $75 million, and Mr. Murphy valued the combined company at $72.8 million. Both assumed (contrary to our factual findings in Cavallaro II) that Camelot had owned the CAM/A LOT technology and that Knight had been a contractor for Camelot.

The Commissioner retained Marc Bello of Edelstein & Co. to determine the 1995 fair market values of Knight and Camelot. His report assumed (correctly,

[*7] per our findings in Cavallaro II) that Knight had owned the significant intangible assets. Mr. Bello adjusted for the non-arm's-length nature of the two companies and then valued the combined entities using a discounted cashflow ("DCF") method. Mr. Bello concluded that the total value of the merged entity was $64.5 million (i.e., less than the value as reckoned by Mr. Maio and Mr. Murphy), that Knight's value was $41.9 million (i.e., 65% of the total), and that Camelot's value was $22.6 million (i.e., 35% of the total). On the basis of Mr. Bello's analysis, the Commissioner argued that the December 31, 1995, merger of Knight and Camelot and the disproportionate distribution of shares resulted in a gift to the Cavallaros' sons totaling $29.7 million. The Cavallaros cross-examined Mr. Bello, challenged his methodology, and alleged that his valuation was flawed for a number of reasons.

Holding in Cavallaro II

In Cavallaro II we found that Mr. and Mrs. Cavallaro's corporation Knight, rather than their sons' corporation Camelot, owned the technology; that "the 1995 merger transaction was notably lacking in arm's length character"; that the merger of the two companies with the issuance of 81% of the stock of the new combined entity to the sons reflected a presumption that Camelot had owned the technology; that the 81%-19% allocation of the stock was therefore not in accord with the

[*8] actual relative values of the two companies; and that the transaction therefore resulted in disguised gifts to the sons.  See Cavallaro II, at *33-*34, *54-*56, *60-*61.

In Cavallaro II we held in favor of the Commissioner on the basis of the Cavallaros' failure to meet their burden of proof.  (They put on no evidence as to the relative values of the two corporations under the correct assumption that Knight, not Camelot, owned the intangibles.)  Consequently, we did not rule on the merits of the Cavallaros' arguments concerning the Bello valuation.  Id. at *52, *60-*61 (citing Graham v. Commissioner, 82 T.C. 299, 308 (1984), aff'd, 770 F.2d 381 (3d Cir. 1985)).  We held that on December 31, 1995, Mr. and Mrs. Cavallaro made gifts to their sons totaling $29.7 million[4] (i.e., the gift tax liability that was based on the Bello valuation).  Id. at *60-*61.

The First Circuit's opinion in Cavallaro III

The Cavallaros appealed Cavallaro II to the U.S. Court of Appeals for the First Circuit, alleging that this Court erred in three respects:  (1) not shifting the burden of proof to the Commissioner; (2) concluding Knight owned the

---

[4]Our prior opinion rounded down the valuation of $29,670,000 to "$29.6 million".  However, the closer rounded value is $29.7 million, which we employ in this opinion.

[*9] intangibles; and (3) misstating the Cavallaros' burden of proof and failing to consider flaws in the Bello valuation. See generally Cavallaro III.

The Court of Appeals held that we were correct in not shifting the burden of proof to the Commissioner, see Cavallaro III, 842 F.3d at 21-23, and affirmed our findings concerning the property ownership issue, id. at 23-25. The Court of Appeals then considered the Cavallaros' argument that we had erred in our statement that they had "the burden of proof to show the proper amount of their tax liability". Id. at 25; Cavallaro II, at *60. The Cavallaros alleged that this "'legal error' * * * led to another: the court refused to consider their evidence that the Bello valuation was 'fatally flawed.'" Cavallaro III, 842 F.3d at 25. On this issue the Court of Appeals agreed with the Cavallaros and found that we misstated the content of their burden. Id. at 26. The Court of Appeals stated:

> [W]e remand so that the Tax Court can evaluate the Cavallaros' arguments that the Bello valuation had methodological flaws that made it arbitrary and excessive. If the Tax Court determines that the Commissioner's assessment was arbitrary, then it must determine the proper amount of tax liability for itself. * * * The court is free to accept in whole or in part, or reject entirely, the expert opinions presented by the parties on the subject. * * *
>
> *     *     *     *     *     *     *
>
> The extent of any further briefing, hearings, or evidence is left to the Tax Court's sound discretion. [Id. at 27; fn. ref. omitted.]

**[*10]** <u>The Cavallaros' arguments regarding the Bello valuation</u>

In accordance with the directive of the Court of Appeals, we ordered further briefing from the parties on whether the Commissioner's valuation was "arbitrary and excessive" and explained that only after resolving that issue would we order proceedings as to the second issue (the "proper amount of tax liability"). The Cavallaros took this remand as an occasion not only to renew arguments that we had not previously addressed but also to renew arguments that we had previously rejected and to raise new arguments that they had not previously made before this Court.

OPINION

In accordance with the directive of the Court of Appeals, we evaluate "the Cavallaros' arguments that the Bello valuation had methodological flaws that made it arbitrary and excessive." <u>Id.</u> To do so, we ask first whether the $29.7 million value that the Bello report ascribed to the disguised gift is arbitrary and excessive; and we find that it is, on account of one error described below in part II.B.4. That being so, the directive of the Court of Appeals is that we then "must determine the proper amount of tax liability"; and in making that determination we are "free to accept in whole or in part, or reject entirely, the expert opinions presented by the parties on the subject." <u>Id.</u> We find that, after

**[\*11]** we correct the error mentioned above, the Bello report establishes that the value is $22.8 million.

I.     Burden of proof

In general, the IRS's notice of deficiency is presumed correct, "and the petitioner has the burden of proving it to be wrong." Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a). The Court of Appeals held that this Court did not misallocate the burden of proof in Cavallaro II, but it held that we misstated the content of that burden. Cavallaro III, 842 F.3d at 26. Accordingly, on remand the burden of proof remains with the Cavallaros to prove that the Bello valuation had methodological flaws that made it arbitrary and excessive. See Helvering v. Taylor, 293 U.S. 507, 515 (1935) ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid"). If the Cavallaros show the Commissioner's determination to be arbitrary and excessive, then we cannot sustain that determination and we will determine the correct amounts of tax. See id. at 515-516; Cavallaro III, 842 F.3d at 26-27.

We therefore turn to the details of the Cavallaros' critique. The Cavallaros allege that the Bello valuation is arbitrary for a variety of reasons. In reviewing their criticisms, we divide the arguments into two groups: arguments raised

**[\*12]** during the trial of <u>Cavallaro II</u> (discussed below in part II), and arguments not raised during that trial (discussed below in part III).

II.    <u>Arguments raised during the Cavallaro II trial</u>

In their briefs on remand the Cavallaros renewed and expanded upon several arguments that they advanced during the trial in <u>Cavallaro II</u>. The renewed arguments that they raised during trial can be subdivided according to whether they are consistent with our factual findings in <u>Cavallaro II</u>.

    A.    <u>Arguments inconsistent with the Court's findings of fact</u>

Some of the Cavallaros' arguments on remand are implicitly or explicitly contrary to our findings of fact in <u>Cavallaro II</u>. For example, on remand the Cavallaros argue that the Bello valuation erred by not taking into consideration the 1995 "confirmatory" bill of sale that attested to a 1987 transfer between Knight and Camelot, which the Cavallaros contend on remand is a "cloud on the title", and that the Bello valuation therefore erred by not discounting the value of Knight, because a "buyer considering the acquisition of Knight without Camelot would have to take into account the risk that Camelot might claim rights to the IP."

This argument is based on premises that are explicitly contrary to our factual finding that "the [1995] 'confirmatory' bill of sale <u>confirmed a fiction</u>", and "[i]f an unrelated party had purchased Camelot before the merger and had then

**[\*13]** sued Knight to confirm its supposed acquisition of the CAM/A LOT technology, <u>without doubt</u> that suit would fail." <u>Cavallaro II</u>, at \*55-\*56 (emphasis added). The Court of Appeals explicitly affirmed this finding, stating that the Cavallaros "advanced no argument that would warrant overturning the Tax Court's finding that Knight owned all of the CAM/A LOT technology at the time of the merger." <u>Cavallaro III</u>, 842 F.3d at 25; <u>see also</u> <u>id.</u> n.11 ("The record shows that the Tax Court carefully considered the gravitas of the Camelot name stamp and other proprietary claims from the viewpoint of an unrelated purchaser").

The consideration and affirmance of our findings on this issue by the Court of Appeals forecloses all such arguments under the "law of the case" doctrine. "The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" <u>United States v. Moran</u>, 393 F.3d 1, 7 (1st Cir. 2004) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983)); <u>see also</u> <u>Field v. Mans</u>, 157 F.3d 35, 40 (1st Cir. 1998) ("The law of the case doctrine is a prudential principle that 'precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided'" (quoting <u>Cohen v. Brown Univ.</u>, 101 F.3d 155, 167 (1st Cir. 1996))). Under the "mandate rule" (a branch of the law of

[*14] the case doctrine), when the reviewing court prescribes in its mandate that a court shall proceed in accordance with the opinion of the reviewing court, it incorporates its opinion into its mandate. Commercial Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 770 (1st Cir. 1994). "When a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand." United States v. Rivera-Martinez, 931 F.2d 148, 150 (1st Cir.1991) (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice, para. 0.404[1] (2d ed. 1991)).[5]

In Cavallaro III the Court of Appeals did not disturb this Court's factual findings in Cavallaro II, and it found we erred only in one respect. We correct that error in this opinion. Accordingly, on remand we will not allow the Cavallaros to relitigate the ownership of the CAM/A LOT technology by arguing that there was a "cloud on the title",[6] nor will we undertake the chore of considering their other

---

[5]The law of the case doctrine is not completely inflexible, and may "tolerate a 'modicum of residual flexibility' in exceptional circumstances." United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993) (quoting United States v. Rivera-Martinez, 931 F.2d 148, 151 (1st Cir. 1991)). However, the Cavallaros, who would be the proponents of reopening these already decided matters, do not argue any of the exceptions for doing so; and even if they did, none of the exceptions applies to this case. See Bell, 988 F.2d at 251; Rivera-Martinez, 931 F.2d at 151.

[6]If the Cavallaros are arguing not that Camelot owned the intangibles but that prospective buyers of Knight might have supposed that Camelot owned them,

(continued...)

**[\*15]** similarly flawed arguments that are contrary to our undisturbed, post-trial

legal conclusions and undisturbed factual findings.

> B.  Arguments raised at trial that are not inconsistent with
> the findings of fact

Some of the arguments that the Cavallaros advance on remand constitute

arguments (and variations of arguments) that they raised at trial and that do not

contradict our explicit findings.  We summarize those arguments here and find that

only one (discussed below in part II.B.4) has merit.

> 1.  Mr. Bello's supposed bias

The Cavallaros allege that Mr. Bello impermissibly followed the Commis-

sioner's instructions and that this bias caused him to fail to interview the

principals of Knight and Camelot in his process of valuing them and caused him to

fail to do a site visit.  The Cavallaros suggest that these failures caused Mr. Bello

to misunderstand the nature of Knight and Camelot's businesses, which caused

him to overvalue Knight and undervalue Camelot.  The Cavallaros say that Mr.

---

[6](...continued)
and that this supposition would have diminished Knight's fair market value, then
we reject that argument as well.  Such a diminution would have been possible only
if the Cavallaros had publicized the fiction of Camelot's ownership of the
intangibles.  There is no evidence that they did publicize that fiction, and we do
not think that a donor should be able to reduce his gift tax liability by arguing the
hypothetical possibility that the value of his gift was lower because he could have
slandered his own title to the donated assets.

**[\*16]** Bello "acted like a member of Respondent's trial team, not an expert useful to this Court in making technical determinations". They argue that his bias is further shown by errors in his report.

We do not agree. The determination of whether expert testimony is helpful to the trier of fact is a matter within our sound discretion. See Laureys v. Commissioner, 92 T.C. 101, 127 (1989). It is true that an expert is not helpful to the Court and loses credibility when giving testimony tainted by overzealous advocacy. Transupport, Inc. v. Commissioner, T.C. Memo. 2016-216, at \*17-\*18 (collecting cases), aff'd, 882 F.3d 274 (1st Cir. 2018). An expert who is merely an advocate of a party's position does not assist the trier of fact in understanding the evidence or in determining a fact in issue. Id. at \*18 (citing Sunoco, Inc. v. Commissioner, 118 T.C. 181, 183 (2002), and Snap-Drape, Inc. v. Commissioner, 105 T.C. 16, 20 (1995), aff'd, 98 F.3d 194 (5th Cir. 1996)). But Mr. Bello's opinion was not tainted by these flaws, and we found his opinion helpful.

With respect to Mr. Bello's decisions not to not interview the Cavallaros[7] and not to visit Knight and Camelot, he testified credibly that he had enough

---

[7]Similarly, Mr. Maio did not rely on interviews with the Cavallaros--but he still testified that his report was reliable, using information that he received from financial statements and marketing materials and from meeting with management.

[*17] information to understand the companies,[8] so it was not necessary for him to interview the owners of the business nor to make a site visit many years after the merger at issue. We conclude that any errors in his report were the result of mistake and not bias. We are satisfied that Mr. Bello considered the objective and relevant facts, and we conclude that his valuation was not tainted by overzealous advocacy. Mr. Bello's value for the two combined companies (i.e., $64.5 million) was significantly <u>lower</u> than the corresponding values put forth in both of the valuations that the Cavallaros relied upon (i.e., $70-75 million and $72.8 million); and the proportion of that value that Mr. Bello allocated to Knight (i.e., 65%) was well within (and was not at the top of) the range of values that the Cavallaros' accountant postulated in 1994 (i.e., 51% to 85%). See Cavallaro II, at *59-*60. His valuation prompted the Commissioner to make a substantial partial concession before trial (i.e., his valuation caused the Commissioner to change his position in

---

[8]In determining whether a site visit and interviews are necessary, a "determining factor is the degree to which the analyst was able to gather and interpret" written material. Shannon P. Pratt & Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 92 (5th ed. 2008). "The need for the valuation analyst to visit the company facilities and have personal contact with the company personnel and other related people varies greatly from one valuation to another. The extent of necessary fieldwork depends on many things". Id. In this instance, Mr. Bello did not err in his decision, more than a decade after the merger, not to visit the companies' facilities and have personal contact with their personnel, and that decision was not indicative of any bias.

[*18] the Cavallaros' favor). Id. We do not find any merit in the Cavallaros' arguments to the effect that Mr. Bello was biased.

### 2. The profit reallocation calculation

On remand the Cavallaros renew their criticisms of the profit reallocation calculation that Mr. Bello performed before valuing the two companies. They argue that the profit reallocation was generally unnecessary, and they also criticize various aspects of it (i.e., his reasons for performing the reallocation, the reallocation calculation's methodology, the industry classifications, and the inputs that he used, such as the Robert Morris Associates ("RMA") data discussed below).

The Cavallaros' general argument that the profit reallocation was unnecessary is contrary to our finding that "Knight received less income than it should have as the manufacturer of the machines, while Camelot received more than it should have as the mere seller", id. at *20, and to our finding that the allocation of stock in the merger was not done at arm's length, id. at *54-*56. Mr. Bello's profit reallocation corrected for the distortions that we found. According to an authority cited in both parties' briefs, such adjustments to the financial statements "require both analytical judgment and an understanding of accounting principles. * * * [And an] analyst should be guided by common sense, experience,

[*19] and understanding of the compan[ies] in determining what adjustments should be made to present the statements in the manner most appropriate for valuation purposes." Shannon P. Pratt & Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 150 (5th ed. 2008). Mr. Bello's profit reallocation adjustment reflected such judgment and understanding--the correct view, as adopted by this Court, that Knight and Camelot were not dealing with each other at arm's length, that Knight was effectively subsidizing Camelot's operations, and that Knight, rather than Camelot, owned the CAM/A LOT technology. We conclude not only that this part of the valuation was not arbitrary but also, in light of our factual findings in Cavallaro II, that this reallocation (or another similar type of profit normalization between the two companies) was entirely necessary to yield an accurate valuation of the two companies. See Cavallaro II, at *16-*19.

As to the details of Mr. Bello's profit reallocation adjustment, we are not persuaded by the Cavallaros' critique. Mr. Bello sufficiently described the logic and reasoning underlying the steps he performed in the profit reallocation. His selection of the industry classification for the companies was well reasoned, and it was based in part on the industries that the Cavallaros had self-reported. See id. at *41-*42. His decision to use the RMA data--a composite source of privately

[*20] owned company data--is supported by the treatise cited by both parties, which describes the RMA data as "the most popular source of composite company data, including privately owned company data".  Pratt & Niculita, supra, at 110. Thus, we conclude that the individual steps undertaken by Mr. Bello as part of the profit reallocation, the selection of the comparable industries, and the inputs he used in performing the profit reallocation were not "arbitrary" (except for the calculation discussed below in part II.A.4).

### 3.    The discounted cashflow calculation

After performing the profit reallocation between Knight and Camelot, Mr. Bello then valued Camelot and Knight using the DCF method.  The Cavallaros argue that even if the profit reallocation adjustment was justified, and even if there were no errors in the profit reallocation, Mr. Bello's use of the DCF method was arbitrary.  As with their arguments concerning the profit reallocation, the Cavallaros advance criticisms concerning Mr. Bello's use of the DCF method generally and also advance specific criticisms of the inputs underlying the DCF calculation (e.g., the growth rate, the risk premium, and the discount rate).

With respect to their general arguments about the use of the DCF method to value Knight and Camelot--two closely held companies--this argument is not convincing, because this Court has used this methodology to value similar

[*21] property.  See, e.g., Estate of Magnin v. Commissioner, T.C. Memo. 2001-31, 81 T.C.M. (CCH) 1126, 1141 (2001), supplementing T.C. Memo. 1996-25, rev'd and remanded on other grounds, 184 F.3d 1074 (9th Cir. 1999).  Mr. Bello explained why he considered and rejected alternative methodologies--the asset accumulation method/going concern; the market approach; the guideline publicly traded company method; the guideline transaction method; the prior sales method; and the dividend payout method--and in doing so he was appropriately guided by, and considered a number of factors set forth in, Rev. Rul. 59-60, 1959-1 C.B. 237.  Mr. Bello explained convincingly why the DCF methodology that he ultimately selected to determine Knight's and Camelot's values was the best valuation method for this case.

With respect to the Cavallaros' arguments concerning the details of Mr. Bello's inputs for his DCF analysis, such as the risk premiums, working capital, depreciation, capital expenditures, and growth rates, we find that these arguments are also unpersuasive.  Keeping in mind the fact that "[a] determination of fair market value, being a question of fact, will depend upon the circumstances in each case * * * [and] the fact that valuation is not an exact science", Rev. Rul. 59-60, sec. 3.01, 1959-1 C.B. at 238, we think that Mr. Bello adequately explained his rationale behind his selection and use of inputs in his DCF model.  His

[*22] explanations demonstrate that he used "the elements of common sense, informed judgment, and reasonableness" to value Knight and Camelot.  Id.; see 26 C.F.R. sec. 25.2512-2(a), (f), Gift Tax Regs.

In summary, the Cavallaros' criticisms of and arguments concerning the Bello valuation generally lack merit.  Mr. Bello's valuation was not arbitrary and excessive, except in the one respect to which we now turn.

### 4.     The 90th percentile profit margin calculation

When Mr. Bello performed the profit reallocation to normalize the profits between Knight and Camelot, he "calculated the returns available to Camelot based on the expected 4.1% return from the RMA [data] and added a [3.4%[9]] premium to reflect the strategy of premium pricing and higher profitability [totaling 7.5%] as of the valuation date which would put Camelot in the top 90% for all distributors."  The result of this profit allocation calculation is that "both Camelot and Knight were in the top 10% (90th percentile) with regards to profitability within their respective industries."

On remand, however, the Cavallaros pointed out an error in Mr. Bello's attempt to calculate a profit margin that would place each company in the 90th

_____

[9]The Bello report purported to state this premium as 3.65%, but that was a typographical error, and the actual intended premium was 3.4%.  Thus, the total for the return that he used in his calculation was 7.5%.

[*23] percentile of its industry. The Cavallaros demonstrated (and the Commissioner acknowledged) that "[t]he RMA data on which he purports to rely reflect that a profit margin of 7.5% would place Camelot in the 88.3rd percentile", not the 90th. The Cavallaros and the Commissioner subsequently corresponded about how Mr. Bello had arrived at the 7.5% value, and it became clear that Mr. Bello had attempted to extrapolate the 90th percentile through a method that was not statistically reliable. Mr. Bello apparently believed that the underlying data was unavailable, so in his attempt to arrive at the 90th percentile, he employed a method that was not statistically correct. He knew only the mean profit margin from the RMA data, 4.1%. He assumed that the mean profit margin would not be that far off from the median or 50th percentile, so he inferred that the theoretical 100th percentile would be 8.2% and that the 90th percentile would be 7.38% (making the 7.5% figure that he employed in the profit reallocation calculation greater than his inferred 90th percentile).

The Cavallaros characterize this as Mr. "Bello's deceptive and erroneous profit allocation adjustment" and argue that the Court should disregard Mr. Bello's expert report and testimony.[10] Despite this error, the Commissioner defends

_____

[10]We agree that the allocation was erroneous, but we do not at all conclude that it was deceptive. We reject the Cavallaros' contention that this error rendered

(continued...)

[*24] Mr. Bello's 7.5% profit margin on the grounds that he had intended only to make Camelot a "top performer" (not specifically in the 90th percentile) and that even the 88.3rd percentile used in Mr. Bello's analysis, which allocated 35% of the overall value to Camelot, was "generous". But this defense falls flat. At trial and in his report Mr. Bello was very explicit about his intent to place Camelot in the 90th percentile; and even on remand, the Commissioner initially reiterated Mr. Bello's intention to place Camelot in the 90th percentile.[11] But we now know (and the Commissioner admits) that his method did not do so.

Using a profit margin in the 88.3rd percentile versus the 90th percentile makes a substantial difference in the valuation, and therefore a substantial difference in the value of the disguised gift. Using the correct percentage for the actual 90th percentile of net income before tax--9.66%, rather than the 7.5% Mr. Bello used--results in Camelot's having a value of $29.14 million, or 45% of the total value of the combined entities (rather than the $22.6 million value that

[10](...continued)
his entire valuation arbitrary and excessive, or otherwise unreliable.

[11]The Commissioner's brief on remand insisted: "The selection of the 3.4% premium was not 'randomly chosen' * * * as petitioners claim. Rather, as Mr. Bello explains in his report, it was explicitly chosen to put Camelot in the 90th percentile of its wholesaler category peers in terms of profitability, giving it a net profit of 7.5%." (Emphasis added.)

[*25] represented 35% of the combined entities' valuation, as Mr. Bello had computed); and although the Commissioner continues to insist that correction of this error is not necessary or appropriate, he admits that if one does correct for this error, the correction reduces the value of the disguised gift by $6.9 million.[12]

We find that this one error in this subcalculation was arbitrary, and we conclude that it did result in an excessive gift tax determination, which must be corrected.

III.    Arguments made on remand that were not raised at trial

On remand, the Cavallaros advance a number of arguments that they did not make during trial in Cavallaro II.  We reject these arguments both (a) as untimely and (b) on their merits.

A.    The untimeliness of the new arguments on remand

On appeal the Cavallaros attempted to advance new arguments that they had not made before this Court.  The Court of Appeals refused to consider those

---

[12]The parties agree that the substitution of the correct 90th percentile value for the incorrect value (while simultaneously holding all other aspects of Mr. Bello's valuation constant) results in a decrease in the gift's value by $6,879,640.  In this and subsequent discussions, we do not correct for the arithmetical discrepancies that result from rounding.

[*26] arguments.[13] We see in the same light the Cavallaros' attempt, now on remand, to assail the Bello valuation by fact-intensive arguments they did not raise at trial, and we conclude that they waived those arguments.

The Court of Appeals for the First Circuit has explained that whether a party has waived an argument by its failure to raise that argument during an earlier proceeding depends on whether the party had sufficient incentive to raise the issue. United States v. Ticchiarelli, 171 F.3d 24, 32-33 (1st Cir. 1999) (holding that in the criminal context, a defendant may not raise a new argument on remand for resentencing if he or she had reason to raise it initially (citing United States v.

---

[13]In particular, the Cavallaros attempted to contend on appeal "that the Tax Court should have ruled that Camelot owned two crucial property rights at the time of the merger: the trade secrets embodied in Camelot's mechanical drawings and the copyrighted CAM/A LOT operating software." Cavallaro III, 842 F.3d at 24. But in the First Circuit the law "is crystalline: a litigant's failure to explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal." CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1525-1526 (1st Cir. 1996) (quoting Bos. Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993)). The Court of Appeals observed that at trial in Cavallaro II the Tax Court "suggested that assessing potentially discrete proprietary components of CAM/A LOT might be a better approach * * * [and] invited the parties to consider such an approach only insofar as it was helpful to framing the case[s] and clearly warned that such an approach might not 'survive the expert testimony.'" Cavallaro III, 842 F.3d at 24. But the Cavallaros ignored our invitation and continued to press their views--only to later "complain [on appeal] that the Tax Court erroneously treated CAM/ALOT as a 'monolithic property interest,' rather than seeing it for its discrete proprietary components." Id. at 24.

[*27] <u>de la Cruz-Paulino</u>, 61 F.3d 986, 994 n.5 (1st Cir. 1995) (noting, in the context of Fed. R. Crim. P. 12, that "government violations of Rule 12(d)(2) should excuse a defendant's failure to move to suppress evidence prior to trial * * * since defendants have no incentive to move to suppress evidence that the government will not be introducing"))). In <u>Ticchiarelli</u>, 171 F.3d at 33, the Court of Appeals explained that "[t]his approach requires a fact-intensive, case-by-case analysis", so we examine the facts of the instant case:

Before and during trial in <u>Cavallaro II</u>, the Cavallaros had every reason (and every opportunity) to thoroughly analyze and criticize the Bello valuation. Even though the Commissioner's case was based on the Bello valuation, the Cavallaros did not advance several of the criticisms that they now allege on remand. Rather, during their cross-examination of Mr. Bello, the Cavallaros chose to focus almost exclusively on criticizing the "foundational premise" of the Bello valuation: that Knight owned the intangible assets. That is, the Cavallaros put all their chips on that factual issue, but on that issue we found in favor of the Commissioner. See <u>Cavallaro III</u>, 842 F.3d at 23-25; <u>Cavallaro II</u>, at *22-*25. Knight <u>did</u> own the intangible assets. <u>Id.</u>

Now on remand, the Cavallaros are attempting to avoid the consequence of their litigation strategy by advancing new criticisms and arguments. Whether the

[*28] Cavallaros omitted certain arguments because they overlooked them or whether instead such omissions were the result of deliberate choices, the outcome is the same. The Cavallaros had every opportunity and every incentive to advance all possible criticisms of the Bello valuation during the trial in <u>Cavallaro II</u>. We therefore treat the Cavallaros as having waived all arguments that they advance now for the first time on remand.

However, the outcome is the same--i.e., we do not sustain these arguments-- even if we consider them on their merits, which we now do.

B.      <u>The lack of merit of the new arguments on remand</u>

1.      <u>Discounts</u>

The most significant of these new arguments that the Cavallaros direct against the Bello report are its failure to make three discounts, i.e.--

- failing to discount the value of Knight because of the risk of losing its "key man", Mr. Cavallaro[14] (i.e., failing to apply a "key man" discount);

- valuing Knight and Camelot without applying a discount for lack of control; and

---

[14]In <u>Cavallaro II</u> the Cavallaros argued to the contrary: In their post-trial opening brief in <u>Cavallaro II</u>, they argued that "<u>Knight did not have a key leader, comparable to Kenneth Cavallaro</u>"; and in their reply brief they argued that "Kenneth, not William Cavallaro, was the key man in the success of the dispensing machines".

[*29] •    valuing Knight and Camelot without applying a discount for lack of marketability.

Our caselaw does show that these three discounts are properly used in some instances, but the Cavallaros' current argument fails for complete lack of evidence that those discounts would be necessary, or even appropriate, in this particular case.[15]  On the contrary, the only possible inference to be drawn from the record in this case is that those discounts would <u>not</u> be appropriate here, because neither of the Cavallaros' own appraisers, Mr. Maio and Mr. Murphy, made a key man discount or discounts for lack of control or lack of marketability.  The Cavallaros represented that their appraisers' valuations were accurate and that they used "Legally Prescribed and Widely Accepted Methodology", yet those valuations made the same omissions for which the Cavallaros now criticize the Bello report.  No expert in this case used those discounts, and no expert testimony criticized the absence of those discounts.  Consequently, one can hardly say, on this record, that the omission of these discounts from the Bello valuation was an error.

---

[15]There are other discounts that appraisers sometimes apply--e.g., discounts for illiquidity, trapped-in capital gains taxes, "portfolio" (nonhomogeneous assets), contingent liabilities, voting versus non-voting stock, and blockages, <u>see generally</u> Pratt & Niculita, <u>supra</u>, at 397-469--but we would not assume, without evidence, that the absence of any of them would necessarily invalidate a valuation.

**[\*30]** The Cavallaros' general argument that prompted the Court of Appeals to remand this case for further consideration was that the Tax Court "refused to consider <u>their evidence</u> that the Bello valuation was 'fatally flawed.'" Cavallaro III, 842 F.3d at 25 (emphasis added). Of course, the Court of Appeals did not insist that, on remand, the Tax Court should sustain arguments about discounts for which there is no evidence.

The Court of Appeals did order that, on remand, we "<u>may</u> take new evidence, including a new expert valuation". Id. at 27 (emphasis added). But it stated that "[t]he extent of any further briefing, hearings, or evidence is left to the Tax Court's sound discretion." Id. We will exercise that discretion not to conduct a new trial. As we stated in our order directing proceedings on remand--

> Long before the time of the trial of this case, petitioners had clear notice of the factual and valuation issues at stake (including whether Knight owned the technology, and what the values of the companies were if it did). By receipt of Mr. Bello's report * * * [six[16]] months before trial and the taking of his deposition one month before trial, petitioners had every opportunity to develop their contention that Mr. Bello's conclusions were arbitrary and excessive.
>
> At trial, petitioners had every opportunity to put on evidence on all the valuation issues and on all the defects in Mr. Bello's

---

[16]Our order incorrectly stated that the Cavallaros received the Bello report "three months before trial", but in fact they received it on February 17, 2012, and the first day of trial in <u>Cavallaro II</u> was more than six months later on August 27, 2012.

[*31] conclusions. This Court's legal error that the Court of Appeals identified ("the Tax Court did not misallocate the burden of proof at trial" but "misstated the content of that burden", Ct. App. slip op. at 21) occurred after trial in the Tax Court's opinion, not in any ruling before or during trial that could have limited petitioners' ability to put on evidence. Anything omitted [at trial] from petitioners' critique of Mr. Bello was the result of their own choices. * * *

We therefore look to the evidence admitted at the trial already conducted to determine whether and to what extent the Bello valuation erred by not making the discounts for key man, lack of control, or lack of marketability, and we find that there is no evidence of any error in this regard.

###         2.        Transfer pricing allocation

Another new argument on remand that the Cavallaros direct against the Bello report is that it reallocated profits between Knight and Camelot in a manner that was inconsistent with transfer pricing regulations. See 26 C.F.R. secs. 1.482-1(c), 1.482-9(h), 1.6662-6(d), Income Tax Regs.[17] But as with the discounts discussed above in part III.B.1, neither of the Cavallaros' own appraisers, Mr. Maio and Mr. Murphy, made adjustments pursuant to the transfer pricing regulations.

---

[17]The Cavallaros argue: "If a taxpayer presented the Bello Report as evidence to support its transfer pricing, the taxpayer would face penalties for improper transfer pricing under Treas. Reg. § 1.6662-6."

**[*32]** Mr. Maio made no adjustment at all to the allocation of profits between Knight and Camelot--a serious flaw, already discussed in <u>Cavallaro II</u>, at *34. Mr. Murphy's valuation attempted a profit reallocation between the companies by postulating a "royalty" that Camelot would owe to Knight; but in so doing he made no showing of compliance with the selection-of-pricing-method principles of section 482, which the Cavallaros belatedly allege is a standard that should be applied to valuations in this case. In fact, Mr. Murphy's valuation violated that standard, since he argued that no adjustment was necessary but then performed such an adjustment anyway. This approach contradicts the requirement that a taxpayer evaluate the potential applicability of specified methods in a manner consistent with the principles of the best method rule, and reasonably conclude that the method employed is the "most reliable". <u>See</u> 26 C.F.R. sec. 1.6662-6(d)(2)(ii)(A), (3)(ii)(B) and (C), Income Tax Regs.

Section 482 is an income tax provision. It gives the IRS discretion to allocate income and deductions among taxpayers that are owned or controlled by the same interests, for purposes of preventing the evasion of taxes or to clearly reflect income. Broadly speaking, "[t]he purpose of section 482 is to prevent the artificial shifting of the net incomes of controlled taxpayers by placing controlled taxpayers on a parity with uncontrolled, unrelated taxpayers". <u>Sundstrand Corp. &</u>

[*33] <u>Subs. v. Commissioner</u>, 96 T.C. 226, 353 (1991).  Section 482 is expressly applicable when the issue in dispute is the income tax of the subject companies, not the gift tax of their shareholders.  This generality does not mean that principles and authorities under section 482 may never be considered in analogous contexts, see <u>Crown v. Commissioner</u>, 67 T.C. 1060, 1064-1065 (1977) (alluded to section 482 principles in a gift tax case involving an interest-free loan), <u>aff'd</u>, 585 F.2d 234 (7th Cir. 1978); but neither is section 482 the governing authority every time a gift tax valuation requires allocating profits between two companies--and the Cavallaros acknowledge that there is <u>no</u> "legal requirement that one purporting to value a company must always apply transfer pricing principles."  Consequently, we disagree with the Cavallaros' argument that "Bello must identify specific transactions that were conducted off-market and analyze and adjust them" under section 1.482-1(b)(1), Income Tax Regs.

However, even if we were to review Mr. Bello's adjustment under the section 482 standard, we would hold that it satisfies that standard.  "In reviewing the reasonableness of * * * [the Commissioner's] allocation under section 482, we focus on the reasonableness of the result, not the details of the methodology employed."  <u>Bausch & Lomb, Inc. v. Commissioner</u>, 92 T.C. 525, 582 (1989) (citing <u>Eli Lilly & Co. v. United States</u>, 372 F.2d 990, 997 (Ct. Cl. 1967)), <u>aff'd</u>,

**[*34]** 933 F.2d 1084 (2d Cir. 1991). For the reasons set forth in this opinion (and especially in the comparison below), we find that Mr. Bello's result was reasonable by any standard.

IV.     Determining the proper amounts of tax liabilities

As is noted above, we explained to the parties, after the Court of Appeals issued its remand, that we would first determine whether the Bello valuation was "arbitrary and excessive", and that thereafter we would "order proceedings as to the second issue, if appropriate"--i.e., the issue of the correct amounts of the liabilities. Our proceedings to date have identified the sole error in the Bello report (i.e., the 90th percentile profit margin calculation); and the parties agree on the effect of that error (i.e., that the 7.5% profit margin figure places Camelot in the 88.3rd, rather than the 90th, percentile), and they agree on the effect that the error had on the amount of the disguised gifts (i.e., that using the correct 90th percentile profit margin of 9.66% would, in Mr. Bello's calculation, reduce the gifts' total value by $6,879,640). We are therefore able to say now that further proceedings are not necessary.

Because of that error, the Commissioner's valuation was "arbitrary and excessive". Under the remand, we therefore may not let that valuation stand but must determine the proper amounts of the tax liabilities. See Cavallaro III, 842

[*35] F.3d at 27 n.14 (citing Estate of Elkins v. Commissioner, 767 F.3d 443 (5th Cir. 2014), aff'g in part, rev'g in part 140 T.C. 86 (2013)); Taylor v. Commissioner, 445 F.2d 455, 460 (1st Cir. 1971), aff'g T.C. Memo. 1966-29 and Moss v. Commissioner, T.C. Memo. 1969-213. In making this determination we are "free to accept in whole or in part, or reject entirely, the expert opinions presented by the parties on the subject." See Cavallaro III, 842 F.3d at 27 (citing Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938), and Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285).

This one error does not make us unable to use Mr. Bello's valuation, and it does not require a new trial or necessitate receiving additional evidence. Rather, we "accept * * * in part * * * the expert opinion[] presented by * * * [the Commissioner] on the subject." Cavallaro III, 842 F.3d at 27. On the basis of the trial record, the Cavallaros' identification of the error and proposal of a correction, and the Commissioner's acceptance of the Cavallaros' calculation, we are able to correct for this error and determine the proper amount of the Cavallaros' gift. The parties agree that if Mr. Bello had used the correct 90th percentile figure, 9.66% rather than the 7.5% incorrect value, the value of the disguised gifts would be reduced from approximately $29.7 million to $22.8 million, a difference of about

[*36] $6.9 million. We conclude that the $22.8 million value is the correct value of the disguised gifts made by the Cavallaros to their sons.

As a check on the reliability of the Bello report, as thus corrected, we make the following simple comparison of the Bello valuation to the valuations relied on by the Cavallaros:

First, any such valuation must begin with the value of the combined pre-merger companies, and a higher value for the combined companies is disadvantageous to the Cavallaros. Nonetheless, Mr. Bello's combined value ($64.5 million) is <u>lower</u> than the combined value as reckoned by Mr. Maio in 1996 ($70 to $75 million) and by Mr. Murphy in this litigation ($72.8 million). <u>See</u> <u>Cavallaro II</u>, at *32-*33, *37-*39. In comparison to the Cavallaros' valuations, Mr. Bello's $64.5 million valuation is not at all excessive but is more favorable to the Cavallaros.

Second, the valuation must determine what portion of that combined value is attributable to Knight. Mr. Bello's conclusion that Knight accounts for 65% of the combined value is easily within the range that the Cavallaros' own accountant (Mr. Goodman from E&Y) estimated in 1994 (before the Cavallaros' lawyers postulated a fictitious transfer of the intangibles): Mr. Goodman said that in a merger "the majority of the shares (possibly as high as 85%) [will] go[] to" the

**[*37]** owners of Knight (Mr. and Mrs. Cavallaro). Mr. Bello's 65% represents a fairly conservative valuation within Mr. Goodman's range of a "majority" (i.e., greater than 50%) to "possibly as high as 85%".

Third, numbers derived from the Cavallaros' personnel suggest a gift amount not too far off Mr. Bello's. Where a range of possible values is given, we take for this purpose the value within that range that is most favorable to the Cavallaros, as follows: First, to value the combined companies, we use the lower combined value ($70 million) of Mr. Maio's range ($70 to $75 million). Next, for the proportion attributable to Knight, we use the lowest number--51%--from Mr. Goodman's range ("majority" to 85%). Since the owners of Knight received not 51% but only 19% of that value in stock from the merger, we determine that the Cavallaros forfeited in favor of their sons 32% (i.e., 51% minus 19%) of that combined value to which they were entitled. We therefore conclude, under this alternative approach, that they made disguised gifts totaling 32% of the $70 million combined company, or $22.4 million.[18] This amount is reasonably close to the $22.8 amount of the disguised gifts, as calculated after correcting

---

[18]Thus, if we were persuaded that the Bello report was irreparably flawed (we are not), then we could well find on the basis of other evidence in the existing trial record (i.e., Mr. Maio and Mr. Goodman's valuations) that the total value of the disguised gift was at least $22.4 million.

[*38] Mr. Bello's computation for the one error that rendered its conclusion arbitrary and excessive, as we explained above in part II.B.4. The corrected $22.8 million value of the disguised gift that is yielded by Mr. Bello's methodology is less than 2% higher than the $22.4 million amount suggested by our rough-and-ready use of the numbers derived from the Cavallaros' own personnel. We think this further validates our conclusion.

CONCLUSION

We have considered all of the Cavallaros' criticisms of the Bello valuation and, except for their objection to Mr. Bello's flawed 90th percentile profit calculation, we find that they are without merit. For the reasons set forth above and argued by the Commissioner, we find now that, aside from the one previously discussed exception (which rendered the Commissioner's valuation "arbitrary and excessive"), Mr. Bello's inputs and methodology were reasonable; and we conclude that his valuation reasonably determined Knight and Camelot's total combined fair market value. After correcting for the one error in Mr. Bello's allocation of that total value between Knight and Camelot, we conclude that Mr. and Mrs. Cavallaro made gifts totaling $22.8 million on December 31, 1995.

**[*39]** So that Mr. and Mrs. Cavallaro's separate gift tax liabilities can be recomputed,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.